**Bertram N. PERRY, Plaintiff,**

v.

**Alvin GOLUB et al., Defendants.**

**Civ. A. No. 75–G–1476–S.**

United States District Court,
N. D. Alabama, S. D.

Sept. 11, 1975.

William F. Gardner, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, Ala., for plaintiff.

Edward H. Levi, Atty. Gen., Washington, D. C., for defendants.

John J. Pagano, Equal Employment Opportunity Commission, Washington, D. C., for Golub and Hollowell.

Hubert A. Grissom, Jr., Johnston, Barton, Proctor, Swedlaw & Naff, Birmingham, Ala., for Falkowski.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PRELIMINARY INJUNCTION HEARING

GUIN, District Judge.

The plaintiff's motion for a preliminary injunction was heard by the Court on August 29, 1975 following notice to all parties. Subject matter jurisdiction, personal jurisdiction over defendants, and venue are not contested. The Court has jurisdiction under 28 U.S.C. § 1343.

### I.

### FINDINGS OF FACT

Based on the testimony of the witnesses and the exhibits introduced at the hearing, the Court finds that the plaintiff has shown through the evidence that the standards required for preliminary injunctive relief are satisfied.[1]

*A. Substantial likelihood that plaintiff will prevail on the merits:*

This case arises from the "permanent reassignment"[2] of plaintiff Bertram N. Perry from his position of Deputy District Director of the Birmingham District Office of the Equal Employment Opportunity Commission, to be accomplished by placing him on a "detail" of 120 days or less in Washington, D.C. and then reassigning him to another position. The central issues are whether this permanent reassignment was attributable to improper reasons and whether the procedure followed in implementing this permanent reassignment was improper.

*(1) Reason for the action:*

■ The initial issue is whether (as plaintiff contends) this reassignment was motivated by the fact Mr. Perry protested and eventually reported to the United States Attorney certain "irregularities" in the handling of cases by District Director Evelyn Falkowski or whether (as defendants contend) it was based on a personality conflict and attendant leadership problems between Mr. Perry and Ms. Falkowski. The Court finds from the evidence introduced at the hearing that Mr. Perry's reassignment was motivated by a desire to remove the source of potentially embarrassing revelations concerning the Birmingham office and by a displeasure with Mr. Perry's actions in continuing to protest the District Director's conduct and in taking the matter to the United States Attorney.[3]

The facts as established through the evidence are as follows:

1. Mr. Perry has been with the EEOC in the Birmingham District office since 1968 and has been the Deputy Director of the office since 1972. He is regarded as one of the most outstanding persons in the EEOC. All of the witnesses, including the defendants' witnesses, agreed that he has superior abili

---

1. E. g., *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572–573 (5th Cir. 1974). It might be noted in the interest of complete analysis that the defendants agree that this case should be decided on the basis of the traditional standards governing preliminary injunctions and do not assert any arguments regarding administrative remedies or any different considerations as to injunctions in cases involving Government personnel.

2. While the testimony was replete with conflict and confusion regarding the nature of the action in question, it was characterized by Acting Executive Director Alvin Golub as being a "permanent reassignment". In view of the undisputed facts that the intention was to remove the plaintiff from the Deputy District Director position in the Birmingham

office and that he would not be returned, this seems to be the most accurate phraseology.

3. It should be noted that the Court is not passing on the propriety or impropriety of the District Director's actions. That is a question to be resolved by Judge Pointer in the suit brought by the District Director challenging her removal. For purposes of the case before this Court, it is enough that Regional Director Hollowell testified that the investigation resulting from the plaintiff's reports showed what he regarded as "overtones of malfeasance" and "abuses of authority". Nothing said in this case should preclude the District Director from contending or attempting to show that the Regional Director's findings were in error.

ty in the substantive principles of Title VII law and in EEOC compliance procedures, is extremely hard working, insists on quality and dedication in the work performed by EEOC personnel, and has an intense desire to upgrade the ability and workmanship of all EEOC personnel. To the extent that the evidence indicated any fault in Mr. Perry, it is that he does not "suffer fools gladly" and has vocally expressed his criticism of substandard work and departures from EEOC procedures. While he might well benefit from more tolerance of those whose abilities and dedication to work do not match his own, it is abundantly clear that the action taken against him could not be justified on the basis of any deficiencies in his abilities.

2. Ms. Falkowski became Director of the Birmingham office in November of 1974. Within several weeks thereafter, Mr. Perry observed that she was engaging in certain actions which he considered to be improper. According to the evidence in this case, these actions included issuing a cause decision in a case pending in court before receiving the investigator's report on which the decision was supposed to be based, giving instructions to "fail conciliation" (that is, to refuse to settle regardless of any offers made by the respondent), giving instructions to remove a no cause decision from the file in a case pending in court after unsuccessfully trying to change it to a cause decision, and accusing a respondent of destroying and altering records without evidence it was doing so and then blaming this accusation on someone else. The suggestion of the evidence was that many of these actions were seemingly designed to use the Commission's procedures to assist certain plaintiffs and their attorneys in pending court cases.

3. Mr. Perry objected to these actions on the ground that cases should be decided on their facts and in accordance with the EEOC procedures and that Ms.

Falkowski's actions could cause the courts and the public to lose confidence in the EEOC. On numerous occasions, he expressed his protests against these actions to Ms. Falkowski, to Regional Director Hollowell, and eventually to the United States Attorney.

4. In March of 1975, Regional Director Hollowell assigned a "Regional Review Team" to review the operations of the Birmingham office during the period since Ms. Falkowski had become District Director. The report of the Regional Review Team subsequently led him to conduct a closer investigation into her activities as District Director. This included the propounding to her of written questions regarding the matters which had been reported by Mr. Perry, as illustrated by the following:

"Johnson et al vs. University of Alabama (Birmingham Campus)—

Query Number 1

In view of the fact that a right-to-sue letter had been issued 9–24–74 and a suit filed December 26, 1974; and, inasmuch as ordinarily the administrative process automatically ceases whenever a suit is filed;

a. Why was an investigation of Martha Johnson's charge renewed?

b. At whose instance was it renewed?

c. Did the fact that the aforementioned civil action was pending in any way affect the decision to recommence the investigation?

\*    \*    \*    \*    \*    \*

Query Number 2

Since the record file shows that the issuance date of the LOD (2–7–75) [4] is seven days earlier than the issuance date of the investigative memorandum signed by the supervisor (2–14–75), please state:

a. How do you account for the LOD having been issued by you a week in advance of the issuance of the investigative memorandum?

4. The "LOD" is the determination of cause or no cause.

b. Since the investigative memorandum had not been issued at the time the LOD was written, upon what evidence was the LOD based?

\*   \*   \*   \*   \*   \*

Query Number 8

In part II why does the LOD state that the charging party has been discharged when in fact she has never been discharged?

Query No. 11

You wrote a letter to Dr. Joseph F. Volker, President of the University of Alabama-Birmingham on March 19, 1975 indicating that certain officials 'have been and currently are altering and destroying records and other documents which are or may be material evidence in these cases—.' Since this is an extraordinarily serious accusation which is forbidden by the federal regulations, please state upon what specific and objective information you accused state officials of said illegal conduct.

\*   \*   \*   \*   \*   \*

Morgado vs. Jefferson County Defense Corps—

Query Number 1

Inasmuch as permission had been gotten from D & I to issue a 'no cause' as of April 29, 1975 on the issue of 'failure to reclassify—sex', why was not the LOD issued?

Query Number 2

On May 30, 1975, you issued the following memorandum ostensibly through the deputy to the supervisors —'when there has been a private suit filed under the 1866 Civil Rights Act, we should never issue a 'no cause' determination unless this is consistent after examining all evidence obtainable from private plaintiff's attorney.'—

Was the issuance of said memorandum in any way related to the instant case or those who have an interest therein?"

It is obvious that these questions were incisive and precisely directed to the points which had been the subject of Mr. Perry's protests and reports.

5. Mr. Hollowell testified that the results of these investigations revealed that Ms. Falkowski was engaged in conduct which he characterized as having "overtones of malfeasance" and as "abuses of authority". The defendants therefore do not deny that the protests which Mr. Perry had been expressing were shown by the investigation to be well-founded.

6. On July 1, 1975, Regional Director Hollowell suspended Ms. Falkowski's authority to "sign off" (that is, to issue) decisions, settlements, and conciliation agreements. Thereafter, by memoranda issued on July 3 and 8, 1975, Mr. Perry was given authority in his capacity as Deputy Director to review and approve cases and to exercise certain management functions.

7. Although Mr. Perry's protests were ultimately vindicated by the investigation, it is undisputed that the defendants were not pleased with his actions in protesting and reporting these matters. Ms. Falkowski, for example, attempted to have him removed from office through an "adverse action", which was rejected on the ground that it would not be upheld by the Civil Service Commission. Similarly, Regional Director Hollowell instructed him not to have any further discussions with the United States Attorney.

8. The situation in the Birmingham office was the subject of a series of meetings held in Washington over a period of four days. These meetings were attended by approximately seven EEOC officials, including Acting Executive Director Golub and Regional Director Hollowell. The initial "consensus decision" of at least the majority of the EEOC officials attending these meetings was that Ms. Falkowski would be removed and that Mr. Perry would remain in the office. Thereafter, however, this consensus decision was overruled by Act-

ing Executive Director Golub, who decided that Mr. Perry was to be removed from the Birmingham office. Since Acting Executive Director Golub is second only to the Chairman in the EEOC chain of command, the other EEOC officials acquiesced in his decision.

9. Having reversed the consensus decision, Mr. Golub called an EEOC personnel official into the meeting and asked him whether the desired end could be accomplished by using the "detail" procedure, to which he received an affirmative answer. Regional Director Hollowell thereafter issued a notice which directed Mr. Perry to report on "detail" to Washington effective August 25, 1975, pending reassignment to some unidentified location. This notice was received by Mr. Perry on August 15, 1975, thus giving him ten days to comply with these instructions.[5]

10. The defendants contend that the last-minute overruling of the consensus decision was based solely on the alleged personality conflict and resulting leadership problems between Mr. Perry and Ms. Falkowski and that Mr. Perry's protests regarding the District Director's activities had nothing to do with it. The evidence does not substantiate this contention and on the contrary points clearly to a causal nexus between Mr. Perry's protests and the decision to remove him from his position as Deputy Director of the Birmingham office.

For example, the defendants' contention rests on Mr. Perry's arguments with Ms. Falkowski, but the defendants do not deny that these arguments resulted from or consisted in substantial part of his continued protests against her actions as District Director. Similarly, the defendants agreed that there has been a "running rift" between Ms. Falkowski and Supervisor of Conciliations Charles Davis. As one of the defendants' witnesses testified, Ms. Falkowski had "the same problem" with Mr. Davis.

However, Mr. Davis, who did not join Mr. Perry in his protests and has not been to the United States Attorney, was not removed, reassigned, or detailed. The defendants offered no explanation for this difference in treatment, and it is a fair inference from the evidence that it was at least partially due to the fact that Mr. Davis did not protest and report the irregularities in the District Director's activities in office.

So also, the decision to remove Mr. Perry from his position was reached at the conclusion of the series of meetings at which the situation which had been uncovered in the Birmingham office as a result of his reports was discussed, and it is inconceivable that the focus of these meetings was on a personality conflict. The defendants would have the Court find that the high ranking EEOC officials attending the meetings were relatively unconcerned about the uncovering of conduct by the District Director which, according to Regional Director Hollowell, "would have prevented the EEOC from being able to protect charging parties in a number of cases" and devoted their attention instead to a personality conflict. That is far too illogical to accept. The conclusion which conforms with logic and with the evidence is that these meetings focused on the serious problem of Ms. Falkowski's actions and Mr. Perry's continued protests and reports regarding her actions.

Similarly, the thinly-veiled warnings given to Mr. Perry when he continued to protest Ms. Falkowski's conduct in the face of earlier admonitions that he should in effect "leave it alone" cannot be disregarded. The Court finds that the statements made to Mr. Perry—such as "You don't want to be branded as a problem-maker. And you know what I mean" and "If you continue to pursue the Falkowski matter, it will only cause a close look at you"—were meant to convey the message that one who calls at-

---

5. It was subsequently agreed by counsel for the parties that the deadline would be changed to September 2, 1975 in lieu of applying to the Court for a temporary restraining order.

tention to an internal problem may himself be treated as a "problem-maker" and may suffer for having done so.[6]

The contention that Mr. Perry's reassignment was based solely on a personality conflict is furthermore inconsistent with the past history of the Birmingham office. While the defendants sought to portray Mr. Perry as having chronic conflicts with Directors, the picture which emerged from the evidence was that he has had such conflicts only with Directors whose actions do not conform to his standards of objectivity and quality. For example, a previous Director of the Birmingham office credibly testified that he and Mr. Perry had a pleasant and productive relationship. Similarly, when Mr. Perry had conflicts with a previous Director, the action taken was the reassignment of the Director.[7] It was not until Mr. Perry had protested and reported the irregularities being engaged in by District Director Falkowski that he was himself removed, and it is a logical inference from the evidence that this removal was attributable to more than a personality conflict.

Moreover, to accept the defendants' contention that the removal of both Mr. Perry and Ms. Falkowski was motivated solely by their personality conflict would require acceptance of the corollary proposition that Ms. Falkowski's removal had no connection with her conduct in office even though it had been found, according to Regional Director Hollowell, that "there might even be some compliance indiscretions on her part that were having a negative effect on charging parties, respondents, and the Commission" and that "the errors, if unchecked, would have prevented the EEOC from being able to protect charging parties in a number of cases." The Court cannot accept the illogical conclusion that with this information in the possession of responsible officials of the EEOC, the removal of Ms. Falkowski was based solely on a personality conflict. The Court is persuaded that Ms. Falkowski's removal was based on the results of the investigations instigated by Mr. Perry's protests and that Mr. Perry's removal was based on the ground that he was creating potential embarrassment to the EEOC by continuing to protest the District Director's activities and by calling the matter to the attention of the United States Attorney. In effect, the decision was that "Falkowski must be removed because of what she's been doing and Perry must be removed before he blows the lid off any more than he has and to show him that we meant it when we told him to leave it alone."

11. The Court finds that Acting Executive Director Golub's action in overruling the consensus decision and enforcing a new decision to remove Mr. Perry from the Birmingham office was based on an effort to silence Mr. Perry's protests and reports and to punish him for not heeding the instructions to "leave it alone" and that it was arbitrary and an abuse of administrative discretion.

12. The defendants concede that the duties of Mr. Perry's position as Deputy District Director included the responsibility to report departures from established EEOC procedures and do not dispute that he had the Constitutional right to speak out against the District Director's irregularities in the performance of her office.

---

6. An innocuous meaning could not reasonably be given to these warnings. As the Fifth Circuit recently said in finding an improper motive in the statements of a defendant:

"When extracted from its natural context, Harper's language may indeed appear ambiguous. When set within the framework of the evidence as a whole, however, its meaning is clear." *Sabala v. Western Gillette, Inc.*, 516 F.2d 1251 (5th Cir. 1975).

7. The suggestion by defendants' counsel that this previous Director voluntarily left the Birmingham office resulted in obvious reactions of incredulity and shock on the part of EEOC officials in the courtroom, including witnesses for both the plaintiff and the defendants.

*(2) Procedure followed:*

■ The evidence regarding the procedure followed in implementing the proposed permanent reassignment can best be described as a morass of inconsistencies in the defendants' evidence. While the defendants' witnesses agreed that the Civil Service Commission regulations define a "detail" as the temporary assignment of an employee with the intention that he shall return to the position from which he was detailed, they inconsistently testified that Mr. Perry will not return to his position. Similarly, while they agree that the regulations define the situations in which a detail may be used, they inconsistently testified that the EEOC has "administrative discretion" to use a detail in other situations and that it can detail any employee anywhere at any time for any reason.

Entirely aside from these conflicts in the defendants' position, it was clear from the evidence that the action in question was not a proper "detail" as defined by the Civil Service Commission regulations. The regulations provide that "A detail is the temporary assignment of an employee to a different position for a specified period, with the employee returning to his regular duties at the end of the detail" and that "the employee continues to be the incumbent of the position from which detailed." Since the defendants' witnesses consistently testified that Mr. Perry was being "permanently reassigned" and would not return to his position, it is obvious that this plan was not a detail as defined by these provisions of the regulations. The regulations further provide that "Details are intended only for meeting temporary needs of the Agency's work program when necessary services cannot be obtained by other desirable or practical means." The evidence in this case, however, indisputably established that this was not at all the intended purpose. The defendants' witnesses did not even try to claim that there was any work elsewhere for which necessary services could not be obtained by other desirable or practicable means. It was instead obvious from their testimony that this was the converse case of removing the plaintiff and thereafter trying to find some place to put him. Even at that, Acting Executive Director Golub showed considerable discomfort on the witness stand when he was questioned about the work Mr. Perry would be doing and was able to give only vague answers to the questions.

For these reasons, the Court finds that Mr. Perry's permanent reassignment was not a detail as defined in the regulations.

2. If it were necessary to give a label to the proposal, it would be an "adverse action". The regulations provide that an adverse action includes "reduction in rank or pay" and that "In law and the Commission's regulations, the term rank means something more than a numerical grade, or class, or level under a classification system or its equivalent in the coordinated Federal Wage System. Basically, it means an employee's relative standing in the agency's organizational structure, as determined by his official position assignment.—When an employee is made the subject of an official personnel action which results in a lowering of his relative standing in the Agency's organizational structure, a reduction in rank has occurred, even though the employee has not been reduced in numerical grade, or class, or level." In this case, the Court finds from the testimony of Acting Executive Director Golub that the job he says he has in mind for Mr. Perry would result in a lowering of his relative standing in the Agency's organizational structure.

Moreover, the defendants' witnesses sought to justify Mr. Perry's permanent reassignment on the basis of the phraseology that it would "promote the efficiency of the service." It is significant that in doing so, the witnesses were using the provisions of the regulations that "Adverse action may not be taken against an employee covered by this chapter except for 'such cause as will

promote the efficiency of the service'" and that an agency may "remove, demote, or reassign to another position any employee in the competitive service whose conduct or capacity is such that his removal, demotion, or reassignment will promote the efficiency of the service."

3. The defendants concede that Ms. Falkowski's attempt to remove Mr. Perry through an adverse action in June of 1975 was rejected on the ground that it would not be sustained by the Civil Service Commission.[8] It is apparent that the action taken against Mr. Perry was cast in the form of a detail because it could not be accomplished through an adverse action.

The defendants further concede that the action against Mr. Perry was taken without compliance with the provision of the regulations that "The agency must observe certain procedural requirements when processing an adverse action", including at least thirty days advance notice which must state any and all reasons for the proposed action, the making available to the employee of all materials relied on for the proposed action, allowing the employee a reasonable amount of time to secure affidavits and prepare an answer, and the giving of a written decision before the adverse action is effected.

■ Since the action in question was an adverse action concededly taken without compliance with any of the prerequisite procedural safeguards, and was cast in the form of a detail which did not conform to the applicable regulations for the reason that an adverse action could not be upheld, it was arbitrary and an abuse of discretion and as well an infringement of Mr. Perry's Constitutional rights.

4. In the final analysis, it is not necessary to a resolution of the preliminary injunction phase of this case to decide whether Mr. Perry's reassignment was a "detail" or an "adverse action" or something else. It is the substance and not the form which is controlling, and the overriding and determinative point is that regardless of the form in which it may be cast, the action taken against Mr. Perry has been shown by the evidence at the hearing to be improper. Even if it were a detail, it would not be any less improper, since a legal wrong cannot be transformed into allowable conduct by clothing it in an innocuous form.

*(3) Summary:*

In sum, based on the facts as found from the evidence presented at the hearing, the Court finds that there is a substantial likelihood that the plaintiff will prevail on the merits on any one or more of the following grounds:

First, that the "permanent reassignment" constituted an attempt to prevent him from discharging the duties of his office or to injure him in his person or property on account of the lawful discharge of the duties of his office.[9]

Second, that it was arbitrary and an abuse of administrative discretion.[10]

Third, that the actions taken against the plaintiff constituted an infringement of his First Amendment and Fifth Amendment rights.

*B. Substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted:*

■ The defendants argue that it is common to detail Government employees to temporary duties elsewhere. That is doubtless so, but it has no application to

---

8. The regulations provide that "A just and substantial cause is necessary as a basis for an adverse action" and that "any adverse action taken must be based on good cause, be consistent with other such actions taken by the agency, and be fair and equitable."

9. 42 U.S.C. § 1985(1).

10. 5 U.S.C. § 706. The Court is aware that there are conflicting views as to a Court's jurisdiction and review rights under this statute. Since this ground is not necessary to this decision, there is no need to resolve these conflicts.

the facts of this case. The evidence in this case established without dispute that while Mr. Perry's reassignment has been phrased in the form of a detail, it in actuality consists of a plan to remove him from his position as Deputy District Director of the Birmingham office and to reassign him permanently elsewhere, with the intention being that he would not be returned to the Birmingham office.

The defendants further argue that the resulting separation from his family on the one hand or the necessity of taking his children out of the Birmingham schools in which they are enrolled is merely an "inconvenience". Even accepting that proposition for purposes of analysis, the effect on Mr. Perry's career cannot be so lightly dismissed.

During his seven year career with the EEOC's Birmingham District Office, Mr. Perry has been successively promoted from the positions of investigator and conciliator to Supervisor of Investigations and Deputy District Director, he has served as Acting District Director, he has been rated above average, superior, and outstanding on most of his performance appraisals and has received a number of commendations for his work, and he has established a reputation as one of the most outstanding officials in the EEOC. The injurious impact of the proposed plan on this hard-earned record and on his future career could be incalculable. Even though he might ultimately regain his position in the Birmingham office by reason of a final decision in this lawsuit, no one could doubt that he would carry the stigma of having been involuntarily removed from his position. The stain cast on a person's reputation by an accusation quite often remains unerased by a subsequent vindication.

Moreover, the evidence satisfies the Court that the threatened action would irreparably damage Mr. Perry's status in the Birmingham office. It was apparent from the evidence, and in particular the testimony of former District Director Thomas McPherson, that Mr. Perry's insistence upon quality work and dedication to the task of the EEOC has created some resentments and negative reactions toward him on the part of less able and less dedicated subordinates in the Birmingham office. This resentment and negative reaction provokes no sympathy, since it is after all the duty of a Deputy Director to direct subordinates in the proper performance of their work.[11] The Court has no doubt that Mr. Perry's removal would lead these subordinates to believe they had prevailed against him and that when he ultimately returned to the Birmingham office through this lawsuit, he would have an even more difficult task in attempting to obtain quality workmanship and hard work from them.

Furthermore, it is not necessary for this Court to bottom its conclusion that irreparable injury was shown on the extraordinary nature of the injuries to the plaintiff shown by the evidence. The Court has found that the action taken against the plaintiff was an infringement of his Constitutional rights, and as stated in 11 Wright and Miller, *Federal Practice and Procedure* § 2948, page 440 (1973):

> "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."

For these reasons, the Court finds that there is a substantial threat the plaintiff will suffer irreparable injury if preliminary injunctive relief is not granted.

*C. The threatened injury to plaintiff outweighs any threatened harm which the injunction may do to defendants:*

The evidence indisputably established that the issuance of preliminary

---

11. Those whose background includes service in the Army may recall that directions received from a First Sergeant have a similar tendency to produce negative reactions.

injunctive relief would result in no harm to the defendants. While there was some half-hearted and after-thought suggestion that Mr. Perry's excellent abilities may have been needed in the Washington office, the evidence left no doubt that this theory was totally devoid of any substance and that the motivating force behind the proposed reassignment was to remove him from the Birmingham office, with only the most minimal and inconclusive thought having been given to what would be done with him once the purpose of removing him from the Birmingham office had been accomplished.

The Court finds that the threatened harm to the plaintiff without question outweighs any threatened harm which the preliminary injunctive relief would cast on the defendants.

*D. The granting of preliminary injunctive relief will not disserve the public interest:*

The evidence convincingly satisfies the Court that the granting of preliminary injunctive relief would in no way disserve the public interest and would on the contrary be in the public interest. If Mr. Perry had engaged in irresponsible or unfounded accusations against the District Director, the result might well be different. But that is not this case. The defendants themselves agreed that Mr. Perry's reports were well-founded and ultimately led to the uncovering of a situation which, according to Regional Director Hollowell, could have jeopardized the ability of the EEOC to protect charging parties. It clearly was in the public interest that this situation was uncovered as a result of Mr. Perry's protests and reports, and it is equally in the public interest that he should not be penalized for having had the courage and conscience to speak out against it.

Moreover, in the Bicentennial year of this Country, it is well to remember that the bedrock of the 200 year history of our democracy has been the individual rights of the citizen. Indeed, the Court has taken an oath to defend and protect the rights of the citizen. These rights indisputably include the right to speak out against conduct on the part of a Government official, and the evidence before the Court in this case is convincing that the proposal to reassign Mr. Perry was motivated by a negative reaction to the exercise of his right to report and correct the situation in the EEOC Birmingham office. To countenance the plaintiff's proposed reassignment could well cast an inhibiting effect on the exercise of this right, not only by him but on other public servants as well. The public interest clearly dictates that the exercise of this legitimate right by Mr. Perry be protected against the proposal to remove him from the Birmingham office.

With the caveat that this finding is based on the facts of this case and should not be misunderstood as encouraging irresponsible or unfounded accusations in other cases, the Court finds that the granting of preliminary injunctive relief will not disserve the public interest and that it will in fact serve the public interest.

II.

## PROPOSAL FOR THE INITIATION OF ADVERSE ACTION

When it became apparent during the hearing that the action taken against Mr. Perry was not a detail as defined in the Civil Service Commission regulations, the defendants' attorneys suggested that the Court should leave the door open for the initiation of an adverse action against him based on his alleged "insubordination" or "mutiny" [12] toward District Director Falkowski. In effect, the proposal was that since the procedure followed was improper, the Court should authorize the defendants to back up and start anew by processing an adverse action based on his alleged "insubordination".

12. The plaintiff's actions were referred to as "mutiny" by the District Director.

The Court has concluded that this would not be appropriate. Regional Director Hollowell testified that the procedure of removing Mr. Perry from the Deputy Director position by means of an adverse action was proposed by Ms. Falkowski in June of 1975 but was rejected on the ground that it would not be upheld by the Civil Service Commission. In view of this fact, it is apparent that the renewal of an adverse action would have elements of an attempt to circumvent the preliminary injunction. Moreover, the alleged "mutiny" was part and parcel of his opposition to the "irregularities" on the part of the District Director, and the initiation of an adverse action would have the effect of again penalizing Mr. Perry for his actions in protesting the District Director's conduct.

This further comment should be expressed in the hope of avoiding unnecessary complications in this case. It is not within the Court's authority to extend the preliminary injunction to matters not involving Mr. Perry's protests (or "insubordination") regarding Ms. Falkowski's activities or to circumstances or events occurring subsequent to the hearing. However, the fact that Mr. Perry's entire career with the EEOC has been in the Birmingham office and the fact that the adverse action proposed in June of 1975 was rejected on the ground it would not be upheld should suggest that an attempt to remove Mr. Perry from the Birmingham office during the pendency of the preliminary injunction through a procedure or on grounds not covered by the injunction would be subject to close and careful scrutiny.

### III.

### CONCLUSIONS OF LAW

The plaintiff has established through the evidence that the prerequisites to the granting of a preliminary injunction are met and that a preliminary injunction should be granted to protect plaintiff from irreparable injury and to protect the Court's power to render a meaningful decision. E. g., *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567 (5th Cir. 1974).

A preliminary injunction will accordingly be issued.

### IV.

### CONCLUSION

Having reviewed the complaint before the hearing, the Court carried the initial impression into the courtroom that Mr. Perry would have a difficult burden of proof to justify the issuance of a preliminary injunction against the reassignment of an official of an administrative agency. By the end of the day long hearing, the Court was firmly convinced that the evidence had overwhelmingly shown a flagrant mistreatment of a public servant whose dedication and insistence upon quality workmanship were conceded even by the defendants and who clearly deserved commendation and not punishment for having the courage of his convictions to speak out against conduct which was confirmed by the defendants' investigations as being seriously improper and destructive of the important function of the EEOC.

A court certainly cannot step beyond the boundaries of permissible judicial action or seek to solve all the ills which afflict society.[13] Yet there can be no reasonable doubt that a Court would fail to fulfill its responsibilities if it did not extend judicial protection to the plaintiff on the evidence in this case. "The very essence of civil liberty", as Chief Justice Marshall said, "certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury."[14] Guided by this fundamental precept, the Court is confident that Mr. Perry is entitled to the

---

13. See Judge Henry J. Friendly's *Federal Jurisdiction: A General View* (1973).

14. *Marbury v. Madison*, 1 Cranch 137, 163, 2 L.Ed. 60 (1803).

protection of the law on this evidentiary record which reveals a regrettably high-handed and improper treatment of his rights and of the outstanding reputation which he has established as an able and dedicated career officer with the EEOC.