Frank ALVAREZ, Jr., Plaintiff,

v.

Captain Almon C. WILSON, etc., et al., Defendants.

No. 75 C 2734.

United States District Court,
N. D. Illinois, E. D.

March 7, 1977.

Ronald J. Clark, Clark, Howard, Thomas & Piers, Chicago, Ill., for plaintiffs.

Samuel K. Skinner, U. S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM DECISION

MARSHALL, District Judge.

Plaintiff, Frank Alvarez, brought this action against several Navy officers, alleging that they individually and collectively violated his constitutional rights to due process of law and equal protection of the laws. Jurisdiction over this action is allegedly

138

grounded upon 28 U.S.C. § 1331 and 28 U.S.C. § 1343. In its current posture, three issues are presented for decision: 1) whether 42 U.S.C. § 1985 creates a cause of action against federal officials; 2) whether sovereign immunity bars plaintiff's action against these defendants; 3) whether defendants are shielded from liability for money damages by absolute or qualified immunity. After describing the parties and the relevant facts, these issues will be discussed.

## I. *The Parties*

Plaintiff Alvarez was, at the time the alleged occurrences took place, a Lieutenant Junior Grade in the United States Navy. He is no longer in the Navy. His complaint names five defendants, listed in descending order of command: Rear Admiral Warren O'Neil, Captain Almon Wilson, Captain W. J. Wagner, Commander James Devane, and Commander Gary Almy. Rear Admiral O'Neil is Commandant of the Ninth Naval District and commands naval shore activities in twelve states. He controls surface reserves of 14,000 to 15,000 people at 80 Reserve Centers and has a staff of 80 at Great Lakes Naval Base. He also exercises "area command authority"—not direct control—over 160 independent activities and commands in the Ninth Naval District. One of these independent units is the Naval Regional Medical Center (NRMC) at Great Lakes, where plaintiff Alvarez was stationed.

Captain Wilson, a medical doctor, is the commanding officer of NRMC. This hospital has a staff of over 1200 military and civilian employees. Captain Wilson has complete control of the command, organization, and management of NRMC. He directs and oversees patient care and the safety, health, and well-being of the entire NRMC staff. He is responsible to Rear Admiral O'Neil with respect to the coordination of NRMC with other commands in the Ninth Naval District. In other matters, his superior is the Bureau of Medicine and Surgery of the Navy. Captain Wagner, also a medical doctor, is the deputy commanding officer of NRMC at Great Lakes. He is the direct representative of Captain Wilson and he assists him in his medical duties. During the course of the incidents leading to this lawsuit, Captain Wilson was away from NRMC for five days and Captain Wagner was then the acting commanding officer.

Commander Devane is the director of administrative services at NRMC. He is responsible for such day-to-day functions as personnel management, patient affairs, and food services. He works directly under Captain Wilson. Finally, Commander Almy is a medical doctor with a specialty in psychiatry. He is Chief of Neuropsychiatric Service at NRMC. The Service provides for examination, diagnosis, and treatment of Navy personnel needing psychiatric care. Commander Almy's job contains administrative and clinical duties; he supervises a staff and treats patients himself.

The five defendants were on duty in their respective offices at all times during the alleged conduct giving rise to this lawsuit.

## II. *The Facts*

The relevant facts, in summary form,[1] are these. Plaintiff, Frank Alvarez, is a black Puerto-Rican man. He enlisted in the Navy in 1959 and attained the rank of Lieutenant Junior Grade by 1974. Alvarez had a personal commitment towards improving race relations and in 1972, he began to serve on a race relations committee at Great Lakes NRMC, where he was stationed. This committee was named Committee on Equal Treatment and Opportunity (CETO). In April, 1974, his commanding officers, Rear Admiral Turville and Captain John Pruitt, asked him to help implement the Navy's Race Relations Education Program at NRMC.

The Race Relations Education Program was conceived in the wake of racial tensions and disorders within the Navy. Its purpose is to end racial prejudice and to guarantee equal opportunity for all Navy men and

1. The complaint runs on to 335 allegations.

women. To achieve this goal, the Chief of Naval Operations developed a system of seminars for members of the Navy at various levels in the military hierarchy. It was hoped that these seminars would enable Navy officers and enlisted persons to gain awareness of racial tensions among ethnic groups. Each seminar participant would then strive to eliminate personal and institutional racism from the Navy. UPWARD (Understanding Personal Worth and Racial Dignity) seminars were designated for middle management officers, junior officers, and enlisted men. The seminars were to be conducted by RAF (Racial Awareness Facilitators) teams, each with one majority and one minority group member.

Alvarez volunteered to become a Racial Awareness Facilitator. Under orders of his superiors, he attended a training session for several weeks, returned to NRMC, and in June of 1974, began conducting UPWARD seminars with his white partner, Petty Officer Bernard Miller. Meanwhile, the command at NRMC changed and Captain Wilson and Commander Devane replaced Rear Admiral Turville and Captain Pruitt, respectively.

What occurred during the next three months is anything but clear. Alvarez asserts that he seriously and conscientiously tried to conduct effective UPWARD seminars and to improve race relations. He claims that the defendants withheld support and funding for the program, and tried to thwart his efforts. Defendant O'Neil, he claims, specifically cautioned him not to take the race relations program too seriously. Further, the defendants allegedly conspired to cut out the program and silence Alvarez, who was persistent and vocal in his fight against racism. Defendants Wilson, Devane, and Almy harassed Alvarez and his partner by interrupting an UPWARD seminar without warning, destroying the rapport between the RAF team and the participants. Alvarez remained firm in his dedication to his principles and openly criticized his superiors for their negative attitudes. Finally, the defendants suspended the UPWARD seminars, and ordered plaintiff to report to the sick list for psychiatric evaluation. He was hospitalized against his will from September 23 to September 27, 1974 and then released with a finding of no psychosis, no neurosis and no mental impairment. Alvarez claims his Navy career was destroyed as a result. He claims these actions were motivated by racial prejudice.

From the defendant's point of view, the story is radically different. Alvarez had good intentions, they assert, but he used poor tactics and poor judgment. Instead of improving relations between blacks and whites, his intensity alienated people. Before the seminars started, Alvarez had irritated Rear Admiral O'Neil by interrogating him "with a series of inappropriate questions in a very challenging and rude manner." O'Neil Affidavit. After the seminars began, a number of participants complained about the confrontation techniques allegedly used by Alvarez. One woman became so emotionally upset that she was unable to work for a day. By September 18, defendants O'Neil, Wilson, Devane and Almy were fully aware of the complaints and Wilson advised Alvarez to change his style. But the next day, another woman participant became emotionally upset during a seminar session. This "group casualty" led defendant Wilson to immediately suspend the seminars. Psychiatric evaluation for Alvarez was suggested, but he refused to cooperate. Only then did Commander Devane order Alvarez to report for in-patient evaluation. The defendants believed that their actions were essential to preserve the racial harmony which they say was jeopardized by Alvarez's conduct.

Alvarez claims that this course of conduct deprived him of constitutional rights to due process of law and to the equal protection of the laws. Although the facts are stated in Count I, the six-count complaint proposes a number of legal theories for recovery. In Count I, plaintiff alleges that his hospitalization or "incarceration" was a deprivation of liberty without due process of law, and that defendants' conduct amounted to racial discrimination. Count I, it is claimed, arises directly under the due process clause of the

Fifth Amendment. Count II claims that the defendants conspired to deprive plaintiff of equal protection of the laws in violation of 42 U.S.C. § 1985(3). Count III invokes 42 U.S.C. § 1985(1) and claims that defendants conspired to prevent plaintiff from carrying out his duties. The next count, based on 42 U.S.C. § 1986, states that defendants knew that plaintiff's rights under § 1985 were threatened, and refused to prevent the commission of wrongs and injury to him. In these four counts, Alvarez demands compensatory and punitive damages. Jurisdiction of Count I is based on the existence of a federal question, 28 U.S.C. § 1331. The jurisdictional basis of Counts II, III, and IV is 28 U.S.C. § 1343.

■ Counts V and VI are brought as class actions and seek injunctive relief as well as damages.[2] The proposed class consists of minority group members who are or will be [3] stationed at Great Lakes. Count V seeks an injunction prohibiting defendants from threatening or incarcerating any class members because of race. Count VI seeks an injunction restraining defendants from interfering with the Race Relations Education Program at Great Lakes. Jurisdiction is asserted under § 1331.

Defendants urge dismissal of the entire complaint for three reasons. First, they state that Counts II, III, and IV, claiming rights under 42 U.S.C. §§ 1985 and 1986, should be dismissed because these provisions do not create actions against federal officials. Second, they request that Counts V and VI, asking for damages and injunctive relief on behalf of the plaintiff class, be dismissed because they are actually unconsented actions against the United States and are barred by sovereign immunity. Finally, and with the most energy, they claim that all counts for damages should be dismissed under the theory of official immunity. For the reasons discussed below, defendants' motion is denied on all grounds.

### III. Actions Against Federal Officials under § 1985

[2] Defendants claim that § 1985 and its derivative provision, § 1986, do not apply to federal officials. As stated above, Count II rests on § 1985(3), Count III on § 1985(1), and Count IV on § 1986. These sections of the civil rights statutes provide:

§ 1985(1)   If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; . . . or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, . . .

§ 1985(3)   If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, . . . the party so injured, or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

§ 1986   Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, . . . for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; . . .

---

2.  Any claim for injunctive relief on behalf of Alvarez alone would be moot since Alvarez is no longer in the Navy.

3.  Inclusion in the class of those whose rights have not yet been infringed would be improper. *Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 1887 n.3, 48 L.Ed.2d 478.

None of these sections expressly include or exclude federal officers, and the Supreme Court has not decided whether federal officers are within their ambit. Thus, we must be guided by the language, context, and history of § 1985. The scope of § 1986 coincides with its parent provision, § 1985, and need not be analyzed separately.

Unlike § 1983, the text of § 1985 nowhere indicates that defendants must be acting under color of state law. It does not differentiate between state, private, or federal conspiracies. Relying in part on its broad language, the Supreme Court held that § 1985(3) applies to private conspiracies.[4] *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Without specifically mentioning federal officer conspiracies, the Court said that § 1985(3) was aimed against all conspiracies, whatever their source. A fair interpretation of the plain language, then suggests that federally originated conduct is covered.

The context of § 1985(3) is the next factor. Defendants contend that if § 1985(3) were construed to reach federal officials, remedies would be duplicated and the "complementary package" of remedies under the civil rights statutes would be disturbed. Since § 1981 and § 1982 extend to federal action, they argue, § 1985 and § 1986 need not. *District of Columbia v. Carter,* 409 U.S. 418, 422, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973) (§ 1982); *Baker v. F & F Investment Co.,* 489 F.2d 829, 832–33 (7th Cir. 1973) (§ 1981, § 1982). This contention is illogical. Section 1981 and § 1982 are limited to contractual and housing rights respectively. Alvarez has not alleged any deprivation of rights secured under § 1981 or § 1982. Section 1985(3), however, which prohibits racially motivated conspiracies generally, can assist him. If § 1985(3) reaches federal conspiracies, other remedies under the civil rights statutes would not be duplicated.

The history of § 1985(3) should also be considered. Section 1985, along with § 1983, originated in the Civil Rights Act of 1871, also known as the Ku Klux Klan Act.

It was specifically aimed at state officials and members of the Ku Klux Klan (persons who go in disguise on the highway) who had been terrorizing blacks. Primarily, the Civil Rights Act of 1871 is considered an exercise of Congressional power under the Fourteenth Amendment. And the commands of the Fourteenth Amendment are addressed only to the state or to those acting under color of state law. *District of Columbia v. Carter, supra,* 409 U.S. at 423, 93 S.Ct. 602. In contrast, § 1981 and § 1982 originated in the Civil Rights Act of 1866. Congress relied upon the Thirteenth Amendment in enacting this statute, and consequently, legislative jurisdiction does not require state action. *Id.* at 424, 93 S.Ct. 602. This distinction suggests that § 1985 does not apply to federal action. Some courts have so held. *Moore v. Schlesinger,* 384 F.Supp. 163 (D.Colo.1974); *Williams v. Halperin,* 360 F.Supp. 554 (S.D.N.Y.1973); *Bethea v. Reid,* 445 F.2d 1163 (3d Cir. 1971).

In *Griffin v. Breckenridge, supra,* however, the Court held that § 1985(3) does not emanate from the Fourteenth Amendment, at least as applied to private conspiracies against black people motivated by racial prejudice. The Court in *Griffin* noted that § 1985(3) is restricted to conspiracies to violate rights protected under the equal protection clause and did not cover conspiracies to deprive persons of other constitutional rights. As applied to complaints of racial discrimination brought by black citizens, then, § 1985(3) is a proper exercise of Congressional power under the Thirteenth Amendment, and state action is not constitutionally required. The court in *Dry Creek Lodge, Inc. v. United States,* 515 F.2d 926, 931 (10th Cir. 1975), extended this line of reasoning and indicated that § 1985(3) reaches federal officials. *Accord, Revis v. Laird,* 391 F.Supp. 1133 (E.D.Cal.1975). We agree with these decisions and hold that federal officers are suable under § 1985(3) for claims of racial discrimination.

There is a striking absence of analysis in the reported decisions concerning the

4. The private conspiracy must deprive the plaintiff of a federally protected right. *Cohen v. Illinois Institute of Technology,* 524 F.2d 818, 828–29 (7th Cir. 1975).

reach of the seldom-used companion provision, § 1985(1). *See, e. g., Wheeldin v. Wheeler,* 373 U.S. 647, 650 n. 2, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963) (hypothesis that § 1985 might apply to federal officers); *Perry v. Golub,* 400 F.Supp. 409, 417 (N.D. Ala.1975) (§ 1985(1) applied to federal officers without discussion). This provision prohibits conspiracies the object of which is to prevent federal and state officers from accepting or holding their offices. The question presented is whether it, too, reaches alleged conduct by federal officers.

One difference between § 1985(3) and § 1985(1) is that § 1985(1) is not expressly limited to conspiracies which violate the equal protection clause. This difference suggests that § 1985(1) might not rest on the anti-slavery amendment, but might instead reach only state action under the Fourteenth Amendment. In light of its legislative history, however, it is more likely that § 1985(1) was meant to eliminate all racially motivated conspiracies to force blacks out of government office. The intent of the predecessor of § 1985, said Justice Frankfurter, was to prevent conspiracies initiated by the Ku Klux Klan, a private organization. *Monroe v. Pape,* 365 U.S. 167, 257, 81 S.Ct. 473, 5 L.Ed.2d 492 (1965) (Frankfurter, J., concurring).[5] Although Justice Frankfurter did not analyze each provision of § 1985 separately, there is no reason to assume that his analysis does not apply to § 1985(1). Thus, as applied to racially motivated conspiracies, § 1985(1), like § 1985(3), is a restraint upon federal officers and private organizations, as well as state action.

Thus, the text, context, and history of the statute, though not totally free from doubt, lead to the conclusion that federal officers may be sued under § 1985(1) and § 1985(3), if the complaint alleges racial discrimination.

**5.** Justice Frankfurter noted that even if § 1985 were enacted pursuant to the Fourteenth Amendment, the Congress which enacted the statute believed that state nonaction, rather than state action, might be sufficient to make the section constitutional. He based this interpretation on the distinction between a *deprivation* of due process of law and a *denial* of equal protection of the laws. *Monroe v. Pape, supra,* at 256 n.87, 81 S.Ct. 473 (Frankfurter, J., concurring).

## IV. *Sovereign Immunity*

The next issue is whether the prayer for injunctive relief in Counts V and VI is barred by sovereign immunity. The named defendants assert that injunctive relief against them would in fact operate against the United States. The United States has not consented to be sued and no statute waives its sovereign immunity.

To counter this attack, plaintiff points out that the United States is not a named defendant. He relies on *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and its progeny. *Young* and subsequent cases hold that neither sovereign immunity nor the Eleventh Amendment prevent actions for injunctive relief against state officers who act in an unconstitutional manner.

In actions against federal officials, however, the presence or absence of the United States does not end the inquiry as to the effect of sovereign immunity. When necessary, that decision must be made in the light of a number of courts that grudgingly apply the doctrine, and a host of commentators who criticize it. *See, e. g., Schlafly v. Volpe,* 495 F.2d 273, 277 (7th Cir. 1974); K. Davis, *Administrative Law of the Seventies* 599 (1976); C. Wright, A. Miller, and E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3655 (1976).

But even if Counts V and VI were directed against the United States, the instant complaint falls within a recognized exception to the insulation of sovereign immunity. In *Larson v. Domestic and Foreign Corporations,* 337 U.S. 682, 689–91, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), the Court stated that sovereign immunity is no barrier if a federal officer is sued for unconstitutional conduct. It makes no difference whether the officer acts outside his authority or if he acts within his authority but that authority itself is unconstitutional. This ex-

ception has been applied in granting an injunction against military officers in *CCCO–Western Region v. Fellows,* 359 F.Supp. 644 (N.D.Cal.1972). And in *Penn v. United States,* 350 F.Supp. 752 (M.D.Ala. 1972), the court held that federal officers were not protected by sovereign immunity for alleged acts of racial discrimination in employment.

Moreover, the Supreme Court recently indicated *sub silentio* that actions for injunctive relief against federal military officers are not barred by sovereign immunity. In *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), plaintiffs alleged that defendants were restricting their first amendment rights. The Court held for the defendants on the merits. Because the defense of sovereign immunity deprives the Court of jurisdiction, the Court would have reached this issue before deciding the merits if the *Larson* exception did not apply.

Consequently, defendants' motion to dismiss Counts V and VI under the doctrine of sovereign immunity is denied.

### V. *Official Immunity*

The final, and most difficult issue, is whether the defendants enjoy official immunity from liability for money damages, and, if so, the scope of that immunity. Before analyzing the immunity issue, we must first clarify why these federal defendants are subject to an action for money damages in the three counts (I, V, and VI) that arise directly under the Constitution and not under the civil rights statutes.[6]

In *Bivens v. Six Unknown Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Court established a right of action for damages against federal officials who violate the Fourth Amendment. Here, the parties dispute whether a *Bivens* action exists against federal Navy officials for

deprivation of rights to due process of law secured by the Fifth Amendment. This question has two aspects: (1) whether the complaint alleges a violation of federally protected constitutional rights; (2) if so, whether federal courts may fashion a remedy in damages. *Bivens, supra; Williams v. Brown,* 398 F.Supp. 155 (N.D.Ill.1975); W. Dellinger, *Of Rights and Remedies: The Constitution as a Sword,* 85 Harv.L.Rev. 1532 (1972).

■ The complaint alleges that defendants unlawfully deprived plaintiff of liberty without due process of law when they hospitalized him without a hearing or other safeguard or procedural due process for five days. Alvarez also claims that the various defendants all discriminated against him on the basis of race, and this is the more important allegation. The due process clause of the Fifth Amendment clearly embraces principles of equal protection of law guaranteed by the Fourteenth Amendment. *Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). And intentional discriminatory conduct by federal officials, regardless of the fairness of the laws under which they act, constitutes a violation of the concept of equal protection of law. *Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *United States v. Falk,* 479 F.2d 616 (7th Cir. 1973). There can be no question that Alvarez's complaint alleges deprivation of federally protected rights.[7]

■ The remaining question is the power of the court to shape a remedy in money damages. Recognizing that damages is the traditional legal remedy, this court recently held that money damages are appropriate in an action against city officers and the City of Chicago for an unlawful arrest and confinement arising under the due process clause of the Fourteenth Amendment. *Wil-*

---

**6.** In *Bivens v. Six Unknown Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Court held that federal defendants were subject to an action for damages arising under the Fourth Amendment. Only then did the Court remand the case to the Court of Appeals for the

Second Circuit to decide the immunity question.

**7.** The sufficiency of the allegations that defendants were engaged in a conspiracy, however, is not presently before the court.

*liams v. Brown,* 398 F.Supp. 155 (N.D.Ill. 1975). The *Williams* case is clearly apposite with respect to plaintiff's allegations that the hospitalization deprived him of liberty without due process of law. Money damages are also appropriate to redress racial discrimination. Several courts have held that damages are available in racial discrimination cases brought against private citizens and state officials under § 1981, § 1982, and § 1983. *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *McCrary v. Runyon,* 515 F.2d 1082, aff'd., *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). In *Maybanks v. Ingraham,* 378 F.Supp. 913 (E.D.Pa.1974), the court held that defendant was subject to an action for damages directly under the Fourteenth Amendment for allegations of racial discrimination. There is no reason to deny compensatory and punitive damages for the same substantive constitutional violation in an action against federal officials brought directly under the due process clause of the Fifth Amendment. *States Marine Lines, Inc. v. Shultz,* 498 F.2d 1146, 1157 (4th Cir. 1974).

Having decided that defendant naval officers are subject to a damage action under the Fifth Amendment, defendants' claims of immunity must be considered.

Both parties seem to agree that some kind of immunity protects the defendants because defendants had discretionary functions and were acting within the scope of their authority.[8] Plaintiff, however, asserts that defendants have only a qualified immunity and that defendants can be held liable unless they are acting in good faith. Defendants, on the other hand, seek absolute immunity from liability. They claim that the action against them for money damages is absolutely barred, even if they acted with a malicious intent to deprive plaintiff of essential constitutional rights. Alternatively, defendants claim that the af-

fidavits they have submitted show as a matter of law that they were acting in good faith.

The choice between absolute and qualified immunity must be made in view of judicial developments in three lines of immunity cases. The first line of cases, starting with *Barr v. Mateo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), grants absolute immunity to discretionary federal officials for tortious conduct committed within the scope of their authority. *Doe v. McMillan,* 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1972); *Estrada v. Hills,* 401 F.Supp. 429 (N.D.Ill.1975). The second line of cases, spearheaded by *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), holds that state officials sued under § 1983 for violations of constitutional rights, enjoy only a qualified immunity. They are immune only if they acted in good faith. *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). The instant case represents the third line—a hybrid action, a claim against federal officials seeking relief for their alleged unconstitutional conduct. The Supreme Court has not squarely decided whether the absolute immunity of *Barr* or the qualified immunity of *Scheuer* applies here. The courts of appeals, on the other hand, have followed at least two methods of analysis in deciding the scope of immunity for federal officers sued for unconstitutional conduct.

Reasoning that the weightier factor is the unconstitutional nature of the conduct and not the identity of the defendants' employer, some courts have applied the qualified immunity of *Scheuer* to federally originated constitutional violations. *See, e. g., Zweibon v. Mitchell,* 170 U.S.App.D.C. 1, 516 F.2d 594 (1975); *States Marine Lines v. Shultz,* 498 F.2d 1146, 1157 (4th Cir. 1974). The Seventh Circuit opted for qualified im-

---

**8.** Alvarez argues that defendants' acts were not authorized by Navy regulations, that they acted outside the scope of their duties and that they abused their discretion. Without delving into Navy regulations in detail, we find this conten- tion unpersuasive. All that is required is a general connection between the official duties and the alleged wrongful acts. *Estrada v. Hills,* 401 F.Supp. 429 (N.D.Ill.1975). This general connection is undisputed.

munity when a federal police officer was sued in an action for damages under the Fourth Amendment. *Brubaker v. King,* 505 F.2d 534 (7th Cir. 1974). The court said that the standard for what constitutes a defense for a law enforcement officer is identical under § 1983 and the Fourth Amendment. Other courts, especially before *Scheuer* was decided, made the choice between qualified and absolute immunity on a case by case basis, balancing the policies favoring absolute immunity—the need to free officers from the threat of litigation—with the need to vindicate constitutionally protected rights. *Bivens v. Six Unknown Agents,* 456 F.2d 1339 (2d Cir. 1972).[9]

Despite Brubaker, we feel that it is necessary to examine the policies for and against absolute immunity in this case. Defendants have made strong arguments that military officials should be granted absolute immunity, and these arguments would escape consideration if only qualified immunity were automatically extended.[10] In view of defendants' arguments, it is inappropriate to assume that the holding of Brubaker would govern this set of facts.

■ The policy in favor of absolute immunity is that officers must be free from the threat of damage actions in order to effectively carry out their official duties. The starting point in the analysis is to define and describe those duties. Generally speaking, commanding officers in the armed forces are charged with duties to maintain order and discipline among their troops. They are also responsible for caring for the loyalty and morale of their subordinates, as well as their day-to-day needs. In times of stress, a military organization must emphasize the needs of the group over those of the individual, and consequently its officers may act in more authoritarian fashion than is tolerable in civilian life. These characteristics of military life are justified by the constitutional mission of armed forces to provide for the common defense and to be ready to fight wars should the need arise. *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); *Toth v. Quarles,* 350 U.S. 11, 17, 76 S.Ct. 1, 100 L.Ed. 8 (1955).

These considerations have led some courts to adopt a blanket absolute immunity for all military officers if their acts were within the scope of their duties, especially in negligence actions. *Hass v. United States,* 518 F.2d 1138, 1143 (4th Cir. 1975); *Tirrill v. McNamara,* 451 F.2d 579 (9th Cir. 1971); *contra, Henderson v. Bluemink,* 167 U.S. App.D.C. 161, 511 F.2d 399 (1974). In *Birdwell v. Schlesinger,* 403 F.Supp. 710 (Colo. 1975), the court held that military officers were absolutely immune from liability for money damages, even for unconstitutional conduct.

■ Nevertheless, the individual defendants, especially those at NRMC, are hardly at the brink of combat. These defendants are physicians, administrators, or both. Their primary duty, by their own affidavits, is to provide medical services to patients and to maintain the hospital. They are not responsible for making wartime decisions or training sailors. The nature of defendants' actual duties tempers

---

**9.** Some courts have extended this balancing process to torts committed by federal officials absent allegations of unconstitutional conduct, effectively limiting the absolute immunity of *Barr* to the facts of that case. *Expeditions Unlimited Aquatic Enterprises, Inc., v. Smithsonian Institution* (D.C.Cir.1976). As commentators have noted, the distinction between constitutional and tortious claims may be more formal than substantive in certain contexts. Frequently, the same conduct is actionable under both theories. A wrongful arrest, for example, could lead to a complaint for wrongful imprisonment or a deprivation of liberty without due process of law. *See* K. Davis, *Administrative Law of the Seventies* 580 (1976), who calls these hybrid actions *Bivens* torts. The distinctions between the three lines of immunity cases thus becomes fuzzy in application. *Cf. Bonner v. Coughlin,* 545 F.2d 565 (7th Cir. 1976) (reh. en banc).

**10.** In *Apton v. Wilson,* 165 U.S.App.D.C. 22, 506 F.2d 83, 93 (1974), the court granted qualified immunity to nonmilitary officers and said that such policies go to the showing of whether an officer had a good faith belief, not whether the immunity itself should be qualified or absolute. *Contra, Expeditions Unlimited, supra.*

the military need for absolute immunity. And in light of defendant O'Neil's personal involvement with Alvarez discussed below, policy considerations do not require that he be absolutely immune either.

On the other side of the scales is the severity of the individual deprivation. By enlisting in the Navy, a person is not stripped of all constitutional rights.

A military organization is not constructed along democratic lines and military activities cannot be governed by democratic procedures. Military institutions are necessarily far more authoritarian; military decisions cannot be made by vote of the interested participants . . . [T]he existence of the two systems [military and civilian] [does not] mean that constitutional safeguards, including the First Amendment, have no application in the military sphere. It only means that the rules must be somewhat different." Emerson, *The System of Freedom of Expression* 57 (1970), quoted in *Greer v. Spock, supra,* 424 U.S. at 843–844, 96 S.Ct. at 1220 (Powell, J., concurring).

No citation is needed to illustrate that a person who endures racial discrimination suffers a most severe deprivation of constitutional rights. We can think of no military purpose—neither of discipline, nor order, nor readiness for combat—that would justify absolute immunity for racially discriminatory acts perpetrated by military officers.

Summary hospitalization of emotionally disturbed soldiers or sailors, however, may be permissible in a military setting. Commanding officers must protect the morale of the group, and the well-being of a group of people may be threatened if full and lengthy hearings were constitutionally required before such persons could be placed in a psychiatric ward for observation and treatment. Nevertheless, the need to take speedy action does not mitigate a patient's basic right to procedural due process of law before confinement. Instead, the need for speedy action is one factor to be weighed in determining which procedures are constitutionally required in the specific setting.

*Goldberg v. Kelly,* 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). And the question of what procedures are due is not currently before us.

On balance, policy considerations do not mandate absolute immunity for these defendants. They have a qualified immunity, subject to the defense of good faith.

Before reaching the factual question of the defendants' good faith, specific contentions of defendants O'Neil, Devane, and Wagner should be considered. Rear Admiral O'Neil contends that he should be immune because he had no personal involvement in the decision to hospitalize Alvarez. Further, he states that he had no authority to supervise or command the officers who directed NMRC, and that he was not responsible for plaintiff's hospitalization. But Rear Admiral O'Neil did take part in the Navy's race relations program. He chaired at least one meeting of the Committee on Equal Treatment and Opportunity, and he was concerned with the effect of the NMRC UPWARD seminars on other commands in the area.

Moreover, a defendant is personally involved in the acts of his subordinates if he had knowledge of the conduct and consented to it. He need not actively take part. *Adams v. Pate,* 445 F.2d 105 (7th Cir. 1971); *Butler v. Bensinger,* 377 F.Supp. 870 (N.D.Ill.1974); *Mathis v. Pratt,* 375 F.Supp. 301 (N.D.Ill.1974). Cf. *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). Rear Admiral O'Neil's affidavit shows that he discussed the UPWARD seminars with Captain Wilson. He specifically requested to be informed of developments. He has admitted that he publicly criticized Alvarez. These facts are sufficient to preclude a summary judgment that O'Neil had no personal involvement with Alvarez. The facts here are very different from those in the cases cited above, in which various government officials who had no personal knowledge of the acts of their subordinates were dismissed from the lawsuit.

Defendants Devane and Wagner claim derivative immunity as the direct subordi-

nates of Captain Wilson. Since Captain Wilson has only a qualified immunity, officers Devane and Wagner have the same.

### VI. The Defense of Good Faith

 The elements of the good faith defense are that the defendants subjectively believed in good faith that their conduct was lawful, and that their belief was reasonable. The defendants' subjective state of mind and their motivations, then, are material facts. Generally, summary judgment is an inappropriate tool to determine these facts. It is difficult enough to reconstruct subjective motivations two years after the occurrence with the benefit of live witnesses who can be cross-examined. When there are conflicting affidavits which raise factual questions, it is impossible to do it by affidavit. *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 989 n. 13, 47 L.Ed.2d 128 (1976); *Foster v. Zeeko,* 540 F.2d 1310 (7th Cir. 1976); 10 C. Wright, A. Miller, and E. Cooper, *Federal Practice and Procedure* § 2730, at 583 *et seq.* (1973).

The affidavits, statements, and arguments of both parties convince us that there are genuine issues of material fact concerning the subjective good faith of the defendants. A few examples will illustrate. Defendant O'Neil admits he was irritated with Alvarez, yet he claims he was not "angry" with him. Defendant Almy admits he told Alvarez that Admiral O'Neil wanted to get him out of the Navy, and states, "I believe that Captain Wilson made the remark that Admiral O'Neil was angry, he would just as soon have them out of the service." Yet he also claims, "I had not been told that Admiral O'Neil wanted Lt. Alvarez out of the Navy." In varying degree, the defendants consulted among themselves about the appropriate actions to be taken concerning Alvarez and the UPWARD seminars. Strong, uncontested facts showing that defendants acted with a good faith belief are simply missing in the current stance of the lawsuit.

To sum up, defendants' motion to dismiss is denied in all respects. Pursuant to Fed. R.Civ.P. 23(c)(1), plaintiff is ordered to submit a motion for class certification within 30 days as to his class allegations in Counts V and IV. This cause is set for report on status Friday, April 15, 1977 at 9:30 a. m.