## DISTRICT OF COLUMBIA *v.* CARTER

No. 71–564.  Argued November 6, 1972—Decided January 10, 1973

BRENNAN, J., delivered the opinion for a unanimous Court.

*Richard W. Barton* argued the cause for petitioner. With him on the brief were *C. Francis Murphy* and *David P. Sutton.*

*Warren K. Kaplan* argued the cause for respondent. With him on the brief were *Melvin L. Wulf, Ralph J. Temple,* and *Robert W. Boraks.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

On February 12, 1969, respondent filed this civil action in the United States District Court for the District of Columbia alleging that in 1968 Police Officer John R. Carlson of the Metropolitan Police Department of the District of Columbia arrested him without probable cause and, while he was being held by two other officers, beat him with brass knuckles.  The complaint alleged further that Carlson's precinct captain, the chief of police, and the District of Columbia each had negligently failed to train, instruct, supervise, and control Carlson with regard to the circumstances in which an arrest may be made and the extent to which various degrees of force may be used to effect an arrest.  Respondent sought damages against each defendant upon several theories, in-

cluding a common-law theory of tort liability and an action for deprivation of civil rights pursuant to 42 U. S. C. § 1983, which provides: [1]

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The District Court dismissed the complaint against all defendants without opinion.[2] On appeal, the United States Court of Appeals for the District of Columbia Circuit reversed, holding that the allegations of the complaint were sufficient to state causes of action under both the common-law and federal statutory theories of liability. *Carter* v. *Carlson,* 144 U. S. App. D. C. 388, 447 F. 2d 358 (1971). In sustaining respondent's claims under § 1983, the court held that "[a]cts under color of the law of the District of Columbia are under color of the law of a 'State or Territory' for the purpose of § 1983." *Id.,* at 391 n. 3, 447 F. 2d, at 361 n. 3. We granted certiorari. 404 U. S. 1014. For the reasons stated below, we hold that the District of Columbia is not a "State or Territory" within the meaning of § 1983. We

---

[1] Ku Klux Klan Act of 1871, Act of Apr. 20, 1871, § 1, 17 Stat. 13, Rev. Stat. § 1979, 42 U. S. C. § 1983.

[2] Officer Carlson was never found for service of process. The precinct captain and police chief moved to dismiss the complaint on the ground that it failed to state a claim for which relief could be granted. Their supporting memorandum argued that no tort on their part had been committed, and that in any event they were protected by the doctrine of official immunity. The District of Columbia moved to dismiss the complaint for failure to state a claim, and also on the ground of sovereign immunity.

therefore reverse the judgment of the Court of Appeals insofar as that judgment sustained respondent's claims under § 1983.[3]

I

Whether the District of Columbia constitutes a "State or Territory" within the meaning of any particular statutory or constitutional provision depends upon the character and aim of the specific provision involved.[4] Indeed, such "[w]ords generally have different shades of meaning, and are to be construed if reasonably possible to effectuate the intent of the lawmakers; and this meaning in particular instances is to be arrived at, not only by a consideration of the words themselves, but by considering, as well, the context, the purposes of the law, and the circumstances under which the words were employed." *Puerto Rico* v. *The Shell Co. (P. R.), Ltd.,* 302 U. S. 253, 258 (1937); see *Helvering* v. *Stockholms Enskilda Bank,* 293 U. S. 84, 86, 87–88 (1934); *Atlantic Cleaners & Dyers* v. *United States,* 286 U. S. 427, 433 (1932).

The Court of Appeals' conclusion that the District of Columbia is a "State or Territory" for the purpose of § 1983 was premised almost exclusively upon this Court's earlier determination that "the District of Columbia is included within the phrase 'every State and Territory'" as employed in 42 U. S. C. § 1982. *Hurd* v. *Hodge,* 334

---

[3] We therefore have no occasion to determine whether, as urged by petitioner, the District is not a "person" for the purpose of 42 U. S. C. § 1983. In addition, we intimate no view on the merits of respondent's claims insofar as they are predicated on other theories of liability.

[4] Compare *Hurd* v. *Hodge,* 334 U. S. 24 (1948); *Talbott* v. *Silver Bow County,* 139 U. S. 438 (1891); *Geofroy* v. *Riggs,* 133 U. S. 258 (1890); *Callan* v. *Wilson,* 127 U. S. 540 (1888), with *Bolling* v. *Sharpe,* 347 U. S. 497 (1954); *Wight* v. *Davidson,* 181 U. S. 371 (1901); *Hepburn* v. *Ellzey,* 2 Cranch 445 (1805).

U. S. 24, 31 (1948).[5]   At first glance, it might seem logical simply to assume, as did the Court of Appeals, that identical words used in two related statutes were intended to have the same effect.   Nevertheless, "[w]here the subject matter to which the words refer is not the same in the several places where they are used, or the conditions are different, or the scope of the legislative power exercised in one case is broader than that exercised in another, the meaning well may vary to meet the purposes of the law . . . ." *Atlantic Cleaners & Dyers* v. *United States, supra,* at 433.   And the logic underlying the Court of Appeals' assumption breaks down completely where, as here, "there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed . . . with different intent." *Ibid.*

Section 1982, which first entered our jurisprudence as § 1 of the Civil Rights Act of 1866, Act of Apr. 9, 1866, 14 Stat. 27, provides:

> "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

This provision was enacted as a means to enforce the Thirteenth Amendment's proclamation that "[n]either slavery nor involuntary servitude . . . shall exist within the United States, or any place subject to their jurisdiction." See *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409, 437–438 (1968).   "As its text reveals, the Thirteenth

---

[5] The Court of Appeals also cited *Sewell* v. *Pegelow,* 291 F. 2d 196 (CA4 1961), which, relying upon *Hurd,* also held that the District of Columbia is a "State or Territory" within the meaning of § 1983.   That decision is likewise disapproved.

Amendment 'is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States.' " *Civil Rights Cases,* 109 U. S. 3, 20 (1883); see *Griffin* v. *Breckenridge,* 403 U. S. 88, 105 (1971); *Jones* v. *Alfred H. Mayer Co., supra,* at 437–440; *Clyatt* v. *United States,* 197 U. S. 207, 216, 218 (1905). Thus, it cannot be doubted that the power vested in Congress to enforce this Amendment includes the power to enact laws of nationwide application.

Moreover, like the Amendment upon which it is based, § 1982 is not a "mere prohibition of State laws establishing or upholding" racial discrimination in the sale or rental of property but, rather, an "absolute" bar to *all* such discrimination, private as well as public, federal as well as state. Cf. *Jones* v. *Alfred H. Mayer Co., supra,* at 413, 437. With this in mind, it would be anomalous indeed if Congress chose to carve out the District of Columbia as the sole exception to an act of otherwise universal application. And this is all the more true where, as here, the legislative purposes underlying § 1982 support its applicability in the District. The dangers of private discrimination, for example, that provided a focal point of Congress' concern in enacting the legislation,[6] were, and are, as present in the District of Columbia as in the States, and the same considerations that led Congress to extend the prohibitions of § 1982 to the Federal Government apply with equal force to the District, which is a mere instrumentality of that Government. Thus, in the absence of some express indication of legislative intent to the contrary,[7] there was

---

[6] See *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409, 422–436 (1968).

[7] Although the legislative debate over the 1866 Act did not focus specifically on the District, there are numerous indications that the

ample justification for the holding in *Hurd* that § 1982 was intended to outlaw racial discrimination in the sale or rental of property in the District of Columbia as well as elsewhere in the United States.

The situation is wholly different, however, with respect to § 1983. Unlike § 1982, which derives from the Civil Rights Act of 1866, § 1983 has its roots in § 1 of the Ku Klux Klan Act of 1871, Act of Apr. 20, 1871, § 1, 17 Stat. 13. This distinction has great significance, for unlike the 1866 Act, which was passed as a means to enforce the Thirteenth Amendment, the primary purpose of the 1871 Act was "to enforce the Provisions of the Fourteenth Amendment." 17 Stat. 13; see, *e. g., Lynch* v. *Household Finance Corp.,* 405 U. S. 538, 545 (1972); *Monroe* v. *Pape,* 365 U. S. 167, 171 (1961); see also Cong. Globe, 42 Cong., 1st Sess., App. 68, 80, 83–85. And it has long been recognized that "[d]ifferent problems of statutory meaning are presented by two enactments deriving from different constitutional sources. See the *Civil Rights Cases,* 109 U. S. 3. Compare *United States* v. *Williams,* [341 U. S. 70], with *Screws* v. *United States,* 325 U. S. 91." *Monroe* v. *Pape, supra,* at 205–206 (opinion of Frankfurter, J.).

In contrast to the reach of the Thirteenth Amendment, the Fourteenth Amendment has only limited applicability; the commands of the Fourteenth Amendment are addressed only to the State or to those acting under color of its authority. See, *e. g., Civil Rights Cases, supra; United States* v. *Harris,* 106 U. S. 629 (1883); *United States* v. *Cruikshank,* 92 U. S. 542 (1876). The Fourteenth Amendment itself "erects no shield against merely private conduct, however discriminatory or wrong-

---

Act was designed to "extend to all parts of the country." Cong. Globe, 39th Cong., 1st Sess., 322 (Sen. Trumbull); see, *e. g., id.,* at 426, 474.

ful." [8] *Shelley* v. *Kraemer,* 334 U. S. 1, 13 (1948); see also *United States* v. *Price,* 383 U. S. 787 (1966); *Evans* v. *Newton,* 382 U. S. 296 (1966); *Hodges* v. *United States,* 203 U. S. 1 (1906). Similarly, actions of the Federal Government and its officers are beyond the purview of the Amendment. And since the District of Columbia is not a "State" within the meaning of the Fourteenth Amendment, see *Bolling* v. *Sharpe,* 347 U. S. 497, 499 (1954); *Shelley* v. *Kraemer, supra,* at 8; *Wight* v. *Davidson,* 181 U. S. 371, 384 (1901), neither the District nor its officers are subject to its restrictions.[9]

Like the Amendment upon which it based, § 1983 is of only limited scope. The statute deals only with those deprivations of rights that are accomplished under the color of the law of "any State or Territory." [10] It does not reach purely private conduct and, with the exception of the Territories,[11] actions of the Federal Govern-

---

[8] This is not to say, of course, that Congress may not proscribe purely private conduct under § 5 of the Fourteenth Amendment. See *United States* v. *Guest,* 383 U. S. 745, 762 (1966) (Clark, J., concurring); *id.,* at 782–784 (BRENNAN, J., concurring and dissenting). Cf. *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966).

[9] Thus, unlike the situation with respect to § 1982 and the Thirteenth Amendment, inclusion of the District of Columbia in § 1983 cannot be subsumed under Congress' power to enforce the Fourteenth Amendment but, rather, would necessitate a wholly separate exercise of Congress' power to legislate for the District under Art. I, § 8, cl. 17.

[10] It should be observed that, unlike § 1982, which uses the phrase "every State and Territory" as a mere geographical description, the expression "any State or Territory" in § 1983 constitutes a substantive limitation upon the types of conduct that are prohibited.

[11] As initially enacted, § 1 of the 1871 Act applied only to action under color of the law of any "State." 17 Stat. 13. The phrase "or Territory" was added, without explanation, in the 1874 codification and revision of the United States Statutes at Large. Rev. Stat. § 1979 (1874). Since the Territories are not "States" within the meaning of the Fourteenth Amendment, see *South Porto Rico Sugar*

ment and its officers are at least facially exempt from its proscriptions. Thus, unlike the situation presented in *Hurd,* the instant case does not involve a constitutional provision and related statute of universal applicability. This being so, the considerations that led to an expansive reading of § 1982 so as to include the District of Columbia simply do not apply with respect to § 1983. We must therefore examine the legislative history of § 1983 to determine whether the purposes for which the Act was adopted support a similarly broad construction.

## II

Any analysis of the purposes and scope of § 1983 must take cognizance of the events and passions of the time at which it was enacted.[12] After the Civil War ended in 1865, race relations in the South became increasingly turbulent. The Ku Klux Klan was organized by southern whites in 1866, and a wave of murders and assaults was launched against both blacks and Union sympathizers.[13] Thus, at the opening of the 42d Congress, considerable apprehension was expressed by Republicans about the insecurity of life and property in the South,[14]

*Co.* v. *Buscaglia,* 154 F. 2d 96, 101 (CA1 1946); *Anderson* v. *Scholes,* 83 F. Supp. 681, 687 (Alaska 1949), this addition presumably was an exercise of Congress' power to regulate the Territories under Art. IV, § 3, cl. 2.

[12] See generally K. Stampp, The Era of Reconstruction, 1865–1877 (1965); A. Nevins, The Emergence of Modern America, 1865–1878 (1927).

[13] See Nevins, *supra,* n. 12, at 351. For an appreciation of the nature and character of the Ku Klux Klan as it appeared to Congress in 1871, see S. Rep. No. 1, 42d Cong., 1st Sess. (1871), and the voluminous report of the Joint Select Committee to inquire into the Condition of Affairs in the late Insurrectionary States, published as S. Rep. No. 41, pts. 1–13 and H. R. Rep. No. 22, pts. 1–13, 42d Cong., 2d Sess. (1872).

[14] See Cong. Globe, 42d Cong., 1st Sess., 116–117.

and on March 23, 1871, President Grant sent a message to Congress requesting additional federal legislation to curb this rising tide of violence. Such legislation was deemed essential in light of the inability of the state governments to control the situation.[15] Five days later, Congressman Shellabarger of Ohio introduced the bill that eventually was to become the Ku Klux Klan Act of 1871.[16]

Although there are threads of many thoughts running through the debates on the 1871 Act, it seems clear that § 1 of the Act, with which we are here concerned, was designed primarily in response to the unwillingness or inability of the state governments to enforce their own laws against those violating the civil rights of others.[17] Thus, while the Klan itself provided the principal catalyst for the legislation, the remedy created in § 1 "was not a remedy against [the Klan] or its members but against those who representing a State in some capacity were *unable* or *unwilling* to enforce a state law." *Monroe* v. *Pape*, 365 U. S., at 175–176 (emphasis in original). Senator Pratt of Indiana summarized this concern when he said: [18]

"[O]f the hundreds of outrages committed upon loyal people through the agency of this Ku Klux organization not one has been punished. This defect in the administration of the laws does not extend to other cases. Vigorously enough are the laws enforced against Union people. They only fail in efficiency when a man of known Union senti-

---

[15] See *id.*, at App. 226.

[16] See Cong. Globe, 42d Cong., 1st Sess., 317.

[17] See, *e. g., id.*, at 154–159 (Sen. Sherman), 322 (Cong. Stoughton), 374 (Cong. Lowe), 428 (Cong. Beatty), 516–519 (Cong. Shellabarger), 653 (Sen. Osborn); *id.*, at App. 72 (Cong. Blair), 78 (Cong. Perry), 100–110 (Sen. Pool).

[18] Cong. Globe, 42d Cong., 1st Sess., 505.

ments, white or black, invokes their aid. Then Justice closes the door of her temples."

Similarly, Congressman Hoar of Massachusetts stated:[19]

"Now, it is an effectual denial by a State of the equal protection of the laws when any class of officers charged under the laws with their administration permanently and as a rule refuse to extend that protection. If every sheriff in South Carolina refuses to serve a writ for a colored man and those sheriffs are kept in office year after year by the people of South Carolina, and no verdict against them for their failure of duty can be obtained before a South Carolina jury, the State of South Carolina, through the class of officers who are its representatives to afford the equal protection of the laws to that class of citizens, has denied that protection."

To the Reconstruction Congress, the need for some form of federal intervention was clear. It was equally clear, however, that Congress had neither the means nor the authority to exert any direct control, on a day-to-day basis, over the actions of state officials. The solution chosen was to involve the federal judiciary. At the time this Act was adopted, it must be remembered, there existed no general federal-question jurisdiction in the lower federal courts.[20] Rather, "Congress relied on the

---

[19] *Id.*, at 334.

[20] Original "arising under" jurisdiction, pursuant to Art. III, § 2, cl. 1, was vested in the federal courts by § 11 of the Act of Feb. 13, 1801, 2 Stat. 92, but was repealed only a year later by § 1 of the Act of Mar. 8, 1802, c. 8, § 1, 2 Stat. 132. It was not until 1875 that Congress granted the federal courts "original cognizance, concurrent with the courts of the several States, of all suits of a civil nature at common law or in equity, where the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars, and arising under the Constitution or laws of

state courts to vindicate essential rights arising under the Constitution and federal laws." [21]  *Zwickler* v. *Koota,* 389 U. S. 241, 245 (1967). With the growing awareness that this reliance had been misplaced, however, Congress recognized the need for original federal court jurisdiction as a means to provide at least indirect federal control over the unconstitutional actions of state officials.[22] Congressman Coburn explained: [23]

> "The United States courts are further above mere local influence than the county courts; their judges can act with more independence, cannot be put under terror, as local judges can; their sympathies are not so nearly identified with those of the vicinage; the jurors are taken from the State, and not the neighborhood; they will be able to rise above prejudices or bad passions or terror more easily. . . . We believe that we can trust our United States courts, and we propose to do so."

Thus, in the final analysis, § 1 of the 1871 Act may be viewed as an effort "to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced

the United States . . . ." Act of Mar. 3, 1875, § 1, 18 Stat. 470. The jurisdictional amount has since been raised from $500 to $2,000 by the Act of Mar. 3, 1887, § 1, 24 Stat. 552; to $3,000 by the Act of Mar. 3, 1911, § 24, 36 Stat. 1091; and to $10,000 by the Act of July 25, 1958, 72 Stat. 415. The provision is now codified as 28 U. S. C. § 1331 (a).

[21] The only exception was § 25 of the Judiciary Act of 1789, 1 Stat. 85, providing for Supreme Court review whenever a claim of federal right was denied by a state court.

[22] Thus, as originally enacted, § 1 of the 1871 Act provided that the proceedings authorized by the Act are "to be prosecuted in the several district or circuit courts of the United States. . . ." 17 Stat. 13. This aspect of § 1 is now codified as 28 U. S. C. § 1343 (3).

[23] Cong. Globe, 42d Cong., 1st Sess., 460.

and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies." *Monroe* v. *Pape,* 365 U. S., at 180.

There was no need, however, to create federal court jurisdiction for the District of Columbia. Even prior to 1871, the courts of the District possessed general jurisdiction over both federal and local matters. Act of Mar. 3, 1863, c. 91, 12 Stat. 762. Thus, the jurisdictional aspects of § 1 of the 1871 Act were entirely superfluous with respect to the District. Moreover, while Congress was unable to exert any direct control over the actions of state officials, it was authorized under Art. I, § 8, cl. 17, of the Constitution to exercise plenary power over the District of Columbia and its officers.[24] Indeed, "[t]he power of Congress over the District of Columbia includes all the legislative powers which a state may exercise over its affairs." *Berman* v. *Parker,* 348 U. S. 26, 31 (1954); see *District of Columbia* v. *Thompson Co.,* 346 U. S. 100, 108 (1953); *National Insurance Co.* v. *Tidewater Co.,* 337 U. S. 582, 602 (1949); *Kendall* v. *United States,* 12 Pet. 524, 619 (1838). And since the District is itself the seat of the National Government, Congress was in a position to observe and, to a large extent, supervise the activities of local officials.[25] Thus, the rationale underlying Con-

---

[24] In pertinent part, Art. I, § 8, cl. 17, of the Constitution provides that Congress shall have power "[t]o exercise exclusive Legislation in all Cases whatsoever, over such District . . . as may . . . become the Seat of Government of the United States . . . ."

[25] The District of Columbia police system, for example, was operated under the direction of a board of five commissioners appointed by the President with the advice and consent of the Senate. The statutes creating the metropolitan police system established a network of regulations and reporting requirements that enabled the

gress' decision not to enact legislation similar to § 1983 with respect to federal officials—the assumption that the Federal Government could keep its own officers under control—is equally applicable to the situation then existing in the District of Columbia.

It is true, of course, that Congress also possessed plenary power over the Territories.[26]  For practical reasons, however, effective federal control over the activities of territorial officials was virtually impossible.  Indeed, "the territories were not ruled immediately from Washington; in a day of poor roads and slow mails, it was unthinkable that they should be.  Rather, Congress left municipal law to be developed largely by the territorial legislatures, within the framework of organic acts and subject to a retained power of veto.  The scope of self-government exercised under these delegations was nearly

---

Federal Government to keep a watchful eye over police conduct. See Act of Aug. 6, 1861, 12 Stat. 320; Act of July 16, 1862, 12 Stat. 578.

Respondent seeks to make much of the fact that, in 1871, Congress established a "territorial" form of government for the District of Columbia, with a governor and legislative assembly, to which the general administration of the affairs of the District was committed. Act of Feb. 21, 1871, 16 Stat. 419.  In light of this development, respondent argues, Congress must have intended the word "Territory" in § 1 of the Ku Klux Klan Act to include the District of Columbia.  What respondent apparently overlooks, however, is that on June 20, 1874, the very day that the phrase "or Territory" was formally enacted into the revised version of § 1 of the Ku Klux Klan Act, see n. 11, *supra*, Congress also abolished the "territorial" form of government in the District and, in its stead, authorized the President, with the advice and consent of the Senate, to appoint a commission of three members to exercise the power previously vested in the governor and assembly.  Act of June 20, 1874, c. 337, 18 Stat. 116.

[26] Article IV, § 3, cl. 2, provides: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States. . . ."

as broad as that enjoyed by the States. . . ." *Glidden Co.* v. *Zdanok,* 370 U. S. 530, 546 (1962); see also E. Pomeroy, The Territories and the United States 1861–1890, p. 92 (1947); H. R. Rep. No. 440, 48th Cong., 1st Sess. (1884); S. Rep. No. 1249, 49th Cong., 1st Sess. (1886). Thus, although the Constitution vested control over the Territories in the Congress, its practical control was both "confused and ineffective,"[27] making the problem of enforcement of civil rights in the Territories more similar to the problem as it existed in the States than in the District of Columbia.[28]

Moreover, the effort to analogize the District of Columbia to the Territories in this context faces strong theoretical obstacles. The territorial state has aptly been described as "one of pupilage at best." *Nelson* v. *United States,* 30 F. 112, 115 (Ore. 1887). From the moment of their creation, the Territories were destined for admission as States into the Union, and "as a preliminary step toward that foreordained end—to tide over the period of ineligibility—Congress, from time to time, created territorial governments, the existence of

---

[27] E. Pomeroy, The Territories and the United States 1861–1890, p. 4 (1947).

[28] Moreover, unlike the courts of general jurisdiction in the District of Columbia, which were created under the authority vested in Congress by Art. III, § 1, see *O'Donoghue* v. *United States,* 289 U. S. 516 (1933), the federal courts in the Territories were established under Art. IV, § 3, cl. 2, see *Glidden Co.* v. *Zdanok,* 370 U. S. 530 (1962); *American Insurance Co.* v. *Canter,* 1 Pet. 511 (1828). This distinction also has significance for our problem for, unlike judges in the District, territorial judges were appointed for terms of only four years. Rev. Stat. § 1864 (1874). As a result, the territorial judges were peculiarly susceptible to local pressures, since their reappointments were often dependent upon favorable recommendations of the territorial legislatures. See Pomeroy, *supra,* n. 27, at 98–102.

which was necessarily limited to the period of pupilage."
*O'Donoghue* v. *United States*, 289 U. S. 516, 537 (1933);
see *McAllister* v. *United States*, 141 U. S. 174, 188 (1891).
Thus, in light of the transitory nature of the territorial
condition, Congress could reasonably treat the Territories
as inchoate States, quite similar in many respects to the
States themselves, to whose status they would inevitably
ascend.

The District of Columbia, on the other hand, "is an
exceptional community . . . established under the Con-
stitution as the seat of the National Government."
*District of Columbia* v. *Murphy*, 314 U. S. 441, 452
(1941). As such, it "is as lasting as the States from
which it was carved or the union whose permanent
capital it became." *O'Donoghue* v. *United States, supra,*
at 538. Indeed, it is "the very heart—of the Union
itself, to be maintained as the 'permanent' abiding
place of all its supreme departments, and within which
the immense powers of the general government were
destined to be exercised . . . ." *Id.,* at 539. Unlike
either the States or Territories, the District is truly
*sui generis* in our governmental structure.

With this unique status of the District of Columbia
in mind, and in the absence of any indication in
the language, purposes, or history of § 1983 of a legisla-
tive intent to include the District within the scope of
its coverage, the conclusion is compelled that the Court
of Appeals erred in holding that the District of Columbia
constitutes a "State or Territory" within the meaning of
§ 1983. Just as "[w]e are not at liberty to seek ingenious
analytical instruments" to avoid giving a congressional
enactment the broad scope its language and origins
may require, *United States* v. *Price*, 383 U. S., at 801,
so too are we not at liberty to recast this statute to
expand its application beyond the limited reach Con-
gress gave it. This is not to say, of course, that a claim,

such as a possible claim against Officer Carlson, of alleged deprivation of constitutional rights is not litigable in the federal courts of the District. See *Bivens* v. *Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U. S. 388 (1971); *Bell* v. *Hood,* 327 U. S. 678 (1946). But insofar as the judgment of the Court of Appeals sustaining respondent's claims rested on § 1983, that judgment must be, and is,

*Reversed.*