Rodney TAYLOR, Plaintiff,

v.

Thomas MAYONE, Sheriff of Ulster County, Deputy John Doe and Sergeant John Doe, Defendants.

No. 78 Civ. 4062 (CHT).

United States District Court, S.D. New York.

Nov. 27, 1984.

Louis B. Kimmelman; Evan A. Davis, Susan J. Stabile, New York City, for plaintiff.

Greenhill, Speyer & Thurm, New York City, for defendants; Mitchell Bloch, Milton Thurm, New York City, of counsel.

## OPINION

TENNEY, District Judge.

In this action under 42 U.S.C. § 1983 (1982) ("§ 1983"), plaintiff Rodney Taylor

("Taylor") alleges that defendant David Hyatt ("Hyatt"), a law enforcement officer, used excessive force when he fired his revolver toward Taylor, and that this use of excessive force violated his rights under both the fourth and fourteenth amendments. Specifically, Taylor asserts that the shooting deprived him of liberty without process in violation of the fourteenth amendment, and constituted an unreasonable seizure incident to an arrest in violation of the fourth amendment.[1] Plaintiff seeks compensatory and punitive damages for mental and emotional distress.[2] Defendant argues that the shooting was justified, that Taylor's constitutional rights were not violated, and that Taylor has failed to demonstrate that he suffered injury as a result of the shooting. Defendant also asserts the affirmative defense of qualified immunity.

Because the evidence adduced at trial is insufficient to support a finding that Hyatt violated Taylor's rights under the fourth or fourteenth amendments, the complaint in this action is dismissed on the merits.[3]

### Findings of Fact and Conclusions of Law

Based upon the testimony and evidence presented at a three-day bench trial, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[4]

1. In January 1977, Taylor was a student living in New Paltz, New York. His parents lived in Rosendale, approximately seven to ten miles from New Paltz. Trial Transcript ("Tr.") at 184.

2. On January 16, 1977, Taylor was aware that he was wanted on an outstanding arrest warrant for first degree rape. Tr. at 186, 187, 223.

3. On January 16, 1977, defendant Hyatt was a corporal in the Ulster County Sheriff's Department ("Sheriff's Department"). Tr. at 321.

4. In the early morning of January 16th, when the incident at issue took place, Hyatt was on patrol in the vicinity of Rosendale in car number 97, accompanied by Deputy Donald Tinnie ("Tinnie").[5] Stipulation of Agreed Facts, dated March 1984 ("Stip."), at ¶ 4.

5. Also during the early morning of January 16, 1977, James J. McNamara ("McNamara"), an off-duty police officer, observed Taylor outside a bar in New Paltz. Tr. at 271; Defendant's Exh. D. McNamara knew that a warrant had been issued for Taylor's arrest. Tr. at 272.

6. At approximately 2:55 a.m., after Taylor had gone into the bar, McNamara called the Sheriff's Department. He reported Taylor's location and asked that a patrol unit be sent over as soon as possible. Tr. at 273–274, 283.

7. The dispatcher for the Sheriff's Department related McNamara's report to four radio patrol cars from the Sheriff's Department, including car number 97, manned by defendant Hyatt and Tinnie. Tr. at 297, 325; Defendant's Exh. D.

8. McNamara attempted to restrain Taylor from leaving the bar, indicating that Taylor should wait to speak to certain people who wanted to speak to him. Taylor reacted by stating that he had not raped the alleged victim, and then running away

---

**1.** Plaintiff's claims against two additional parties—Thomas Mayone, the Sheriff of Ulster County and Deputy Donald Tinnie—were previously dismissed on a motion for summary judgment. *See* 574 F.Supp. 609 (S.D.N.Y.1983).

**2.** Claims asserted by plaintiff for injunctive and declaratory relief have already been dismissed. *See id.*

**3.** Because the Court finds that plaintiff's claims are without merit, it does not address Hyatt's affirmative defense of qualified immunity.

**4.** It is undisputed that during the incident in question Hyatt was acting under color of law for the purpose of § 1983, and therefore satisfied the statute's color-of-law requirement.

It is also undisputed that this Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331, 1343 (1982).

**5.** *See supra* note 1.

from McNamara. McNamara pursued him on foot, but lost him after a chase. Tr. at 275–276.

9. McNamara believed that Taylor fled the area in a blue Chevrolet van. Tr. at 276.

10. McNamara flagged down a New Paltz Police Department car, and reported the situation. The New Paltz unit communicated with its radio dispatcher. Tr. at 276.

11. Two officers from the Sheriff's Department then appeared, and McNamara reported the situation to them. At approximately 3:08 a.m., one of the officers communicated with the dispatcher for the Sheriff's Department, and advised that Taylor might be headed north on Route 32 toward the Village of Rosendale, operating a 1968 or 1969 Chevrolet Malibu which was green or blue. Tr. at 276–277; Defendant's Exh. D.

12. The dispatcher then relayed the above information to two radio patrol cars, including car number 97, defendant's car. Tr. at 299, 325; Defendant's Exh. D.

13. At approximately 3:15 a.m., the New Paltz Police Department informed the Sheriff's Department dispatcher that one of its units was in pursuit of a blue Chevrolet which possibly contained Rodney Taylor. Tr. at 299–300; Defendant's Exh. D.

14. The dispatcher then relayed the above information to three radio patrol cars, including car number 97. Defendant's Exh. D.

15. The following information was also transmitted sometime in the course of the three dispatches from the Sheriff's Department: (1) Taylor was wanted under an arrest warrant on a charge of rape, (2) the alleged victim of the rape had been beaten, and (3) Taylor did not like police. Tr. at 303–304, 307.

16. Before Hyatt started his shift that night, he knew that a warrant had been issued for Taylor's arrest. His knowledge was based on a teletype that had been posted in the squad room of the Sheriff's Department. The teletype stated that Tay-

lor was wanted on a charge of first degree rape and that Taylor hated police. Tr. at 322.

Although Hyatt had seen Taylor on several occasions prior to January 16, 1977, he had never spoken to Taylor, arrested him, or had any other personal involvement with him. Tr. at 324, 364–365.

17. After Hyatt and Tinnie received the first radio transmission from the Sheriff's Department around 2:55 a.m., *see* ¶¶ 6, 7, 13, Hyatt proceeded to drive from Kingston toward Rosendale, employing lights and the siren intermittently. Tr. at 325–326.

After receiving further information over the radio, Hyatt turned the car onto Elting Road in Rosendale, where he believed he would intercept the suspect vehicle. Hyatt stopped the car in a westbound position on Elting, in such a way that the car would constitute a partial roadblock. He could hear the siren of what he suspected was the New Paltz police car. He turned on all of the car's lights—the roof lights, grill lights, dual spotlights, and the high beam. Tr. at 326–327, 335. Hyatt advised headquarters in Kingston of his location, and reported that he was setting up the partial roadblock. Hyatt established a partial, rather than a complete roadblock in order to give the suspect vehicle an opportunity to pass safely or stop. Tr. at 363.

18. Taylor's van was being pursued by a marked, New Paltz Police Department patrol car, which was four or five car-lengths behind the van. Tr. at 80. The patrol car was manned by officer John Goldfluss ("Goldfluss"). His assignment on that morning was routine radio car patrol, which primarily involved looking for traffic violations. Tr. at 57–58.

19. Shortly before 3:15 a.m., Goldfluss had been travelling north on Route 32, within the town limits of New Paltz, when he sighted a blue Chevrolet van swerving from side to side. The van, which was also travelling north, was in front of Goldfluss. Tr. at 60–62.

20. Goldfluss suspected that the driver of the van was intoxicated, and—in an ef-

fort to signal the van to pull over—Goldfluss turned on his patrol car's emergency lights (red bar and flashing, rotating beacons) and four alternating, flashing grill-lights. At that point, Goldfluss did not know the identity of the driver of the van. Tr. at 61, 62, 106.

21. Within seconds after the patrol car's lights were turned on, the van began to accelerate and pull away from the patrol car. Tr. at 61, 106, 111. The time was approximately 3:15 a.m. Tr. at 62.

22. Shortly thereafter, Goldfluss reported the pursuit to the New Paltz emergency-communications officer. Goldfluss described what was occurring, gave a description of the van, and provided its license plate number and direction of travel. Tr. at 62, 107–108; Defendant's Exh. A.

23. Goldfluss accelerated to keep up with the van, and at some point turned on his siren. Tr. at 62, 327.

24. Goldfluss received two communications before leaving the town limits of New Paltz. The first, from the emergency-communications officer, was to the effect that the vehicle was registered to an individual with the last name of "Taylor," and with a woman's first name. Tr. at 63, 107. The second, from another police radio car, was to the effect that the operator of the van might be Rodney Taylor who was wanted under an arrest warrant for first degree rape, and that extreme caution should be used. Tr. at 63, 108, 110.

25. Goldfluss was not equipped to receive radio communications from the Sheriff's Department dispatcher. Tr. at 110.

26. Goldfluss pursued Taylor beyond the town limits of New Paltz, through Tillson, through the Town of Rosendale and into the Village of Rosendale. Tr. at 62. The speed of the chase through the rural roadway varied between twenty and seventy miles per hour. Tr. at 64–65. The entire chase lasted about ten minutes, ending at approximately 3:25 a.m., and covering a distance of five to six miles. Tr. at 67, 107; Defendant's Exh. D.

27. Visibility was good. Tr. at 116, 329.

28. The roads were slick in spots. There had been a light snow, or a freezing rain or drizzle, sometime during the night, and there was some snow on the shoulders of the roadway. Tr. at 59, 77, 82; Plaintiff's Exh. 8. The snow had, however, melted in part, so that some of the roadway was dry. Tr. at 116.

29. Taylor's van was equipped with a side-view mirror. His rear view, however, was somewhat obstructed by a pile of wood in the rear of the van. Tr. at 222–223.

30. As Taylor was proceeding north on Route 32 in New Paltz, he noticed, in his side-view mirror, that a marked police car was behind him. Tr. at 228.

31. Taylor was fearful of stopping along the road because he was afraid of the police, and was particularly afraid of pulling over in an abandoned area. Thus, although Taylor may initially have thought that the police car was flashing its lights in order to warn motorists of bad driving conditions, Taylor admits that he subsequently "began driving as fast as the weather conditions would permit so that [he] would not have to stop on a deserted area during the middle of the night." Defendant's Exh. Q (Affidavit of Rodney Taylor, sworn to Aug. 1, 1983), ¶ 11; see Tr. at 234–239.

32. Within a few minutes, Taylor reached the section of Elting Road where Hyatt had stationed his patrol car. Tr. at 295.

33. Hyatt had stopped his car on a portion of Elting Road that runs downhill between two intersections—one with Mountain Road, and the other with Saint James Street. Tr. at 69, 361. Elting Road runs from the Town of New Paltz into the Village of Rosendale. In Rosendale, a piece of Elting Road, running roughly north-south, is intersected at a right angle by Mountain Road, coming from the west. At this intersection, Elting makes a right-angle turn to the east. Elting runs downhill from the right-angle turn for approximately 50 or 60 yards, and then makes another 45° right turn at a telephone pole. After

the telephone pole, the road inclines more steeply for a straight stretch of approximately 100 yards. After this 100-yard straight-away, Elting makes a final, abrupt left turn of roughly 80°. Tr. at 69, 74; Plaintiff's Exhs. 1–16.

34. Hyatt's car was positioned on the straight-away approximately 80 yards downhill, or east, of the telephone pole. Tr. at 69, 133; Defendant's Exh. R. Elting is a two-lane road. Tr. at 327. Hyatt's car was stationed in a west-bound position, heading uphill. It was located in or around the westbound lane. Tr. at 328. The Court concludes, despite conflicting testimony, that the car was positioned so that it crossed over the midpoint of the road and into the eastbound lane. Nevertheless, the eastbound lane was passable. Tr. at 74, 84–85, 328; Plaintiff's Exh. 28. At the point where Hyatt's car was stationed, the width of Elting road was approximately 25 to 30 feet, or roughly the width of three cars abreast. Tr. at 120–121, 327.

35. The area of Elting Road where the roadblock was located was illuminated by two street lamps. One street lamp was located on the telephone pole at the west end of the straight-away, and the other was located further downhill near the 80° curve at the east end of the straight-away. Tr. at 288–289; Plaintiff's Exh. 6.

36. Hyatt was getting out of the patrol car on the driver's side as the Taylor van, travelling eastward, came around the 45° turn at a speed of about 20 miles per hour. Tr. at 117–118, 327, 355.

37. Standing between the car door and the car, Hyatt held onto the door with his left hand, and held his gun in his right. Tr. at 356–358.

38. Taylor did not attempt to stop the van. Tr. at 255.

39. The van travelled down the middle of the road, and veered to the right, into its proper eastbound lane, when it was only 30 yards from Hyatt's car. Just before the van did so, Hyatt saw the driver of the van. Until it veered to the right, the van had been headed in the direction of Hyatt's car. Tr. at 121–122, 255–256, 331.

40. When Taylor approached Hyatt's car, he saw an armed officer—Hyatt—pointing his gun. He increased his speed to approximately 50 miles per hour in order to pass the officer as quickly as possible. Tr. at 254–255, 258–259.

41. Goldfluss expected that the Taylor van would stop before reaching Hyatt's car, so Goldfluss began to slow down. When he realized that the van had not stopped, he increased his speed, and resumed following the van. Tr. at 83, 118, 135–136.

42. As he neared Hyatt's car, Taylor ducked down below his windshield. Tr. at 202–203, 259–260.

43. The van passed immediately alongside the door on Hyatt's car, avoiding the door—behind which Hyatt was standing—by only a few inches. Tr. at 87, 122–123, 333, 373.

44. Hyatt fired his revolver at some point during the time when Taylor's van was passing his car and during the time when Taylor was ducking below the windshield. Tr. at 203, 259–260; Plaintiff's Exh. 25. The bullet hit the van behind and below the front door near the driver's seat. Tr. at 97–99; Plaintiff's Exh. 23. Hyatt fired with the intention of shooting at the driver of the van. Tr. at 372. He fired with a dual purpose: to save his life, and to apprehend Rodney Taylor. Tr. at 332–333.

45. Taylor turned off of Elting at the bottom of the hill, and proceeded toward Rosendale for approximately one-tenth of a mile. He then stopped in front of a hotel, where he was placed under arrest. Tr. at 87–88; Stip. at ¶ 6.

46. Taylor was very frightened and agitated as a result of the incident. Tr. at 209, 210; *see also* 204, 207–208.

47. At the time of the incident, there were regulations in effect in the Sheriff's Department pertaining to the use of deadly force, and the discharge of firearms. Tr. at 40–41; Plaintiff's Exh. 17.

## A. *Due Process Claim*

48. Plaintiff claims that Hyatt used excessive force against him when he fired his gun, and that this use of force constituted a violation of Taylor's due process rights.

49. The "application of undue force by law enforcement officers deprives a suspect of liberty without due process of law." *Johnson v. Glick,* 481 F.2d 1028, 1032 (2d Cir.), *cert. denied sub nom. Employee-Officer John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). The question before the Court is whether defendant's conduct constituted excessive or undue force for the purpose of the fourteenth amendment. That determination depends on "such factors as [1] the need for the application of force, [2] the relationship between the need and the amount of force that was used, [3] the extent of the injury inflicted, and [4] whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Glick,* 481 F.2d at 1033; *see Hodges v. Stanley,* 712 F.2d 34, 36 (2d Cir.1983); *Anderson v. Thomas,* 585 F.Supp. 570, 573 (S.D.N.Y. 1984).

■ Plaintiff, however, takes the position—without the support of authority—that excessive force, for the purpose of constitutional analysis, should be defined by the regulations issued by the Sheriff's Department. Thus, it is plaintiff's theory that under *Glick* the Court should use the departmental regulations to evaluate defendant's conduct and that the determination of whether the shooting was constitutionally excessive should be based on whether the shooting violated those regulations. The Constitution may, however, require more or less than such administrative regulations. Thus, the constitutional analysis must be based on the requirements of the Constitution itself, as interpreted in the case law. The Court will therefore apply the *Glick* analysis without reference to the regulations of the Sheriff's Department.

■ 50. Applying the *Glick* analysis, the Court concludes that Hyatt's firing of his gun did not constitute the use of excessive force under the due process clause. The credible evidence is insufficient to sustain plaintiff's arguments to the contrary, and plaintiff's due process claim must therefore fail.

Plaintiff argues that the shooting was excessive because Hyatt's conduct violated the Sheriff's Department regulations in the following ways: (1) the shooting cannot be justified as an attempt to arrest a fleeing felon since Hyatt lacked a sufficient basis for concluding, prior to firing his gun, that the driver of the van was Rodney Taylor; (2) Hyatt was not justified in shooting at a moving vehicle in light of the following considerations: (i) only the car—and not the driver—can be said to have posed a threat to Hyatt's life, and (ii) Hyatt himself placed his life in danger by not leaving sufficient room for approaching cars to pass by, and by placing the roadblock in a location where approaching cars could not stop without skidding off the road or into Hyatt's car; (3) the van was no longer coming toward Hyatt when he fired his gun; (4) since the arrest warrant was several weeks old, the shooting cannot be justified as an attempt of last resort to apprehend a fleeing felon; and (5) the shooting involved a high risk of endangering innocent persons who might have been in the van. Although the Court, as noted, is not employing the departmental regulations as the basis for evaluating Hyatt's conduct, the Court has considered the substance of plaintiff's arguments in applying the *Glick* analysis, and finds that these arguments must be rejected.

51. The first *Glick* factor to be considered—the need for the application of force—reveals that there were two reasonable grounds for the shooting. First, Hyatt reasonably believed that the Taylor van might cause him serious bodily injury or death. Second, based on the radio transmissions that night, Hyatt reasonably believed that the driver of the van was Rodney Taylor who was wanted for forcible rape, and that Taylor was attempting to avoid arrest.

154

52. The record shows that Taylor's van initially approached Hyatt's car on a collision course and that, although the van veered away to the side, it avoided hitting the door behind which Hyatt was standing by only a few inches. Hyatt also knew that Rodney Taylor, whom he believed to be the driver, was reputed to hate police.

Plaintiff contends that Hyatt did not fire his gun until the van was moving past the police car, and thus, not until it was already clear that the van would *not* injure Hyatt. Plaintiff's evidence, however, is not sufficient to support this contention. The evidence failed to discredit Hyatt's testimony that he believed his life or safety was threatened, and failed to prove that this belief was unreasonable.

53. In addition, based on the three radio transmissions he received, Hyatt had a reasonable belief that the operator of the car was Rodney Taylor, whom he knew was wanted on a charge of forcible rape. Finally, he was aware that the van had been under chase by another police vehicle operating with a siren, and that the van had nevertheless refused to pull over. The roadblock itself, although partial, was clearly identifiable as a roadblock. Finally, even if, as Taylor argues, he reasonably believed that he could not bring his van to a complete stop before reaching Hyatt's car, it is clear from the record that Taylor could have slowed down. The road conditions provided sufficient traction to permit reduction of speed. Indeed, according to his own testimony, Taylor had sufficient traction at that point to *increase* his speed.

54. As for the second factor to be considered in determining whether the use of force was excessive—that is, the relationship between the need and the amount of force used—Hyatt's shooting at Taylor was, under the circumstances, reasonably related to the dual need to protect himself and to apprehend Taylor. Although it was by no means certain that the shooting would protect Hyatt or lead to the apprehension of Taylor, it was apparent that the non-forcible approach already tried—the partial roadblock—had not been successful.

As Taylor's van approached Hyatt, he had no other means of protecting himself or of apprehending the vehicle.

55. The third factor to be considered—the extent of the injury inflicted—also weighs against plaintiff's argument. Taylor does not assert that he was physically injured by the shooting, and his claims for mental and emotional distress amount to little more than a claim that he was frightened by the shooting and that he was very shaken for a relatively short period of time.

56. The fourth factor must be interpreted in the present context as a factor pertaining to the question of whether the defendant acted in good faith. Plaintiff has not shown that Hyatt was acting in bad faith or that he acted "maliciously and sadistically for the very purpose of causing harm." *Glick*, 481 F.2d at 1033. Rather, the evidence supports the view that Hyatt acted in good faith. Although, with the advantage of hindsight, it is possible to question the utility and wisdom of the shooting, the Court cannot conclude that Hyatt's action was taken in bad faith, or that under the circumstances a reasonable police officer would not, absent bad faith, have taken such an action.

57. For the foregoing reasons, the Court concludes that, under the standard adopted in *Glick*, Hyatt did not apply excessive force constituting a due process violation. Therefore, Taylor's due process claim is dismissed.

B. *Fourth Amendment Claim*

58. Plaintiff asserts that Hyatt's shooting at Taylor constituted the application of excessive force in attempting Taylor's arrest, and that Hyatt thereby violated Taylor's fourth amendment right to be free from unreasonable seizures.

59. In advancing this claim, premised on, inter alia, *Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir.1981); *Carter v. Carlson*, 447 F.2d 358, 363 & n. 10 (D.C. Cir.1971), *rev'd on other grounds sub nom. District of Columbia v. Carter*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), plaintiff relies on his argument that

the shooting constituted excessive force under the due process clause, and on the evidentiary analysis accompanying that argument. Thus, plaintiff again relies on the theory that excessive force for the purpose of constitutional analysis should be defined by the regulations of the Sheriff's Department.

The Court again rejects this argument, *see supra* ¶ 49, and applies the *Glick* standard to determine the reasonableness of the shooting for the purpose of the fourth amendment. *Cf. Alberts v. City of New York*, 549 F.Supp. 227, 232–33 (S.D.N.Y. 1982); *Pratt v. Bernstein*, 533 F.Supp. 110, 115 (S.D.N.Y.1981); *see generally Samuel v. Busnuck*, 423 F.Supp. 99, 101 (D.Md. 1976) (in the course of making a lawful arrest, police may use force which is reasonable under the circumstances). For the reasons set out in ¶¶ 51–56, the Court finds that Hyatt did not apply excessive force in attempting to arrest Taylor.

60. Thus, Taylor's fourth amendment claim is dismissed.

### Conclusion

For the foregoing reasons, plaintiff Taylor's complaint is dismissed on the merits. The Clerk of the Court is directed to enter judgment accordingly.

So ordered.