[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 6, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-11981

_____

D. C. Docket No. 99-02843 CV-BBM-1


WILLIAM CHAVIS,

Plaintiff-Appellant,

versus

CLAYTON COUNTY SCHOOL DISTRICT,
JOE A. HAIRSTON, OZIAS PEARSON,
individually and agents and employees
of Clayton County School District,

Defendants-Appellees.


_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(August 6, 2002)**


Before EDMONDSON, Chief Judge, and DUBINA and COX, Circuit Judges.

EDMONDSON, Chief Judge:

Dr. William Chavis ("Plaintiff") appeals the district court's grant of summary judgment for the Clayton County School District ("CCSD") and for the individual defendants on his federal civil rights and pendent state claims. We mainly must determine whether plaintiff has presented evidence supporting a cause of action under the second clause of 42 U.S.C. § 1985(2). We say "yes." We affirm in part and vacate in part and remand.

BACKGROUND

Plaintiff was hired by CCSD as the Director of Certified Personnel. Part of Plaintiff's job was to investigate complaints of misconduct against teachers and other professionals. Plaintiff's immediate boss was Ozias Pearson ("Pearson"), CCSD's Executive Director for Human Resources and Instructional Services. Pearson's immediate supervisor was Joe Hairston ("Hairston"), the Superintendent of CCSD. Plaintiff, Pearson, and Hairston are black men.

Plaintiff presented evidence that Pearson and Hairston, on the basis of race, discriminated against white teachers within the CCSD.[1] One of the incidents of discrimination involved a teacher, DW. DW, a white female, was accused of entering into a sex-for-grades arrangement with a 16 year-old black, male student. Plaintiff testified at his deposition that he believed that "[DW] was . . . a victim of a witch-hunt and I think that she was discriminated against . . . . I don't think that she was given a chance." Plaintiff was assigned to a three-person panel to investigate the allegations against DW. In his deposition, Plaintiff also testified that Defendants had early conversations with one of the panel members about the expected outcome of that investigation, that Plaintiff believed that Defendants wanted the panel to conclude that DW had sexual contact with the 16 year-old boy, and that the panel found insufficient evidence to conclude that DW had sex with the student. The panel recommended, however, that the entire case be reviewed by the Professional Practices Commission (PPC) and that DW be placed on administrative leave, with pay, pending review of the panel's investigation.

After the panel made its recommendation, Hairston sent DW a letter temporarily relieving her of her teaching duties pending a hearing before the Board

---

[1]Because summary judgment was granted to Defendants, we resolve all factual disputes in favor of Plaintiff's version of events. See Brent v. Ashley, 247 F.3d 1294, 1297 n.1 (11th Cir. 2001). The assumed "facts" may turn out to be no more than a fable.

3

of Education or the PPC.[2]  This letter informed DW that, at a future hearing, evidence that she had engaged in sexual relations with the student would be presented.  At his deposition, Plaintiff testified that he expressed his concern that DW's suspension did not comply with the requirements of the state statute governing the suspension and termination of education employees (O.C.G.A. § 20-2-940).  Plaintiff further testified that the proper procedures were not implemented to allow DW to defend herself against the accusations.  Plaintiff testified that he raised these objections with Hairston.

After completing the investigation, Plaintiff was ordered by Pearson to appear at a state magistrate court hearing where the court was attempting to determine whether probable cause existed to arrest DW.  Although Plaintiff's brief claims that Plaintiff was ordered to give favorable testimony for the student-accuser, Plaintiff testified at his deposition that Pearson only ordered Plaintiff to go to the hearing to see if DW changed her story.  Plaintiff has never sworn that Pearson sent him to testify or that Pearson told him to testify untruthfully.

Plaintiff, although objecting, did go to the magistrate court hearing and did testify there.  Plaintiff has said that he testified at the magistrate hearing consistent

---

[2]At least one member of the Board of Education expressed concerns about the procedures used by the school administration in suspending DW.  In October 1997, the PPC exonerated DW of all charges.

with his recollection of the panel investigation. The magistrate court concluded that insufficient probable cause existed to issue an arrest warrant for DW.[3] Plaintiff claims that Pearson and Hairston responded to his testimony -- which was helpful to DW -- at the magistrate hearing by instituting, or attempting to institute, several adverse employment acts against him, including his ultimate demotion from his position as Director of Certified Personnel.

Plaintiff filed suit against the CCSD and against Pearson and Hairston in their individual and official capacities (collectively "Defendants"). Plaintiff alleged that Defendants did these things: (a) conspired to retaliate against him for his testimony in the DW case and for providing assistance to others in their federal civil litigation, in violation of section 1985(2); (b) retaliated against him, in violation of section 1983, for uttering protected speech; and, (c) violated state law. After some discovery, the district court granted Defendants summary judgment on the section 1985(2) and section 1983 claims and declined to exercise pendent jurisdiction over the remaining state law claims. Plaintiff appeals only the grant of summary judgment on the section 1985(2) and section 1983 claims.[4]

---

[3]Later, in June 1998, DW was indicted by a grand jury for the same charges; but she eventually was exonerated after a jury trial.

[4]We affirm the district court's grant -- based on its application of the Pickering balancing test -- of summary judgment to Defendants on Plaintiff's section 1983 claim. Plaintiff has abandoned his claim that the Defendants retaliated against him for assisting in the federal civil litigation of others.

DISCUSSION

Determining whether Plaintiff has presented evidence to support a claim under the second clause of section 1985(2) requires that we focus on the words of this clause of the statute. Title 42, Section 1985(2) of the United States Code, in pertinent part, makes it unlawful for people to engage in certain conspiracies:

> [To] conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

42 U.S.C. § 1985(2) (1994).

---

See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n. 6 (11th Cir. 1989) (issues not argued on appeal are deemed waived, and a passing reference in an appellate brief is insufficient to raise an issue). Chavis argues on appeal that Hairston, in violation of the first clause of section 1985(2), is being paid for his testimony in the instant federal case. Chavis advanced this contention in his brief to the district court in response to the defendants' motion for summary judgment. Chavis did not seek to amend his complaint to add a claim based on the asserted conduct, and the district court did not specifically address this contention. See Fed.R.Civ.P. 15(a); Marsh v. Butler County, Ala., 268 F.3d 1014, 1035 n. 15 (11th Cir. 2001) (en banc) (affirming dismissal of complaint where plaintiffs did not seek to amend the complaint in district court and did not argue on appeal that they should have been allowed to do so). We do not regard this kind of claim as properly before us; we note however, that it is not obvious that such an allegation would state a claim under the first section of 1985(2). See Haddle v. Garrison, 525 U.S. 121, 125, 119 S.Ct. 489, 492, 142 L.Ed.2d 502 (1998) ("The gist of the wrong at which § 1985(2) is directed is . . . [the] intimidation or retaliation against witnesses in federal-court proceedings").

Section 1985(3) provides private parties a cause of action for violation of section 1985(2).

> [I]n any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby **another** is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the **party** so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

Id. § 1985(3) (emphasis added). We understand the word "party" to encompass the preceding word "another," that is, a person to which the conspiracy relates: "another"="party" = victim. We do not agree that the word "party" means only a person who was a named party in an earlier case. See Heffernan v. Hunter, 189 F.3d 405, 410-11 (3rd Cir. 1999); Brever v. Rockwell Intern. Corp., 40 F.3d 1119, 1125 n.7 (10th Cir. 1994); but see Blankenship v. McDonald, 176 F.3d 1192, 1196 (9th Cir. 1999); Rylewicz v. Beaton Services, Ltd., 888 F.2d 1175, 1180 (7th Cir. 1989); cf. McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036 n. 2 (11th Cir. 2000) (en banc) (permitting a claim under section 1985(2) for retaliation against a witness who testified before a federal grand jury).

According to the Supreme Court, the Reconstruction civil rights acts, such as section 1985, are to be "accord(ed) [ ] a sweep as broad as (their) language."

Griffin v. Breckenridge, 403 U.S. 88, 97, 91 S.Ct. 1790, 1796, 29 L.Ed.2d 338 (1971) (citations omitted). We keep this consideration in mind as we examine the second clause of section 1985(2). The second clause of section 1985(2) expressly supports a cause of action against private conspiracies which seek to injure a person "for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." 42 U.S.C. § 1985(2). The "equal protection" language included in the second clause of section 1985(2), requires an allegation of class-based animus for the statement of a claim. See Griffin, 403 U.S. at 102, 91 S.Ct. at 1798 (stating that under section 1985(3) the language requiring an intent to deprive of equal protection means there must be some racial, or perhaps otherwise class-based individually discriminatory claims behind the conspirators' action). In this case, racial animus was alleged and is supported by some evidence. We think the clause's language covers Plaintiff's case.

In considering the scope of the second clause of section 1985(2), we have also taken "cognizance of the events and passions of the time at which it was enacted." District of Columbia v. Carter, 409 U.S. 418, 425, 93 S.Ct. 602, 606, 34 L.Ed.2d 613 (1973) (analyzing section 1983 case). The legislative history behind the Act reflects that, at the time the Ku Klux Klan Act of 1871 was enacted, the

8

42d Congress was concerned about the insecurity of life and property in the South following the Civil War. 409 U.S. at 425, 93 S.Ct. at 607 (citing Cong. Globe, 42d Cong., 1st Sess., 116-117). Discrimination on the basis of race was at the heart of this concern. A principal concern of the 42d Congress was to protect newly-emancipated blacks, and those who championed them, against conspiracies to violate their civil rights, including acts of retribution against those supporting the civil rights of black people.[5] See United Broth. of Carpenters and Joiners of America, Local 610, AFL-CIO v. Scott, 463 U.S. 825, 836, 103 S.Ct. 3352, 3360, 77 L.Ed. 2d 1049 (1983) (discussing legislative history in context of section 1985(3) claim); see also Cong. Globe, 42 Cong., 1st Sess., 157; id. at App. 190-93.

We know that, although the first clause of section 1985(2) specifically prohibits injuring a witness on account of his testifying in federal court, the second

---

[5]Section 1985(2) uses words like "any citizen" and "any persons." In enacting post-Civil War legislation, Congress's immediate concern was the plight of newly-emancipated blacks and those who championed their cause, but these laws protect against all kinds of race-based discrimination. See McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 295-96, 96 S.Ct. 2574, 2586, 49 L.Ed.2d 493 (1976) (determining that white plaintiff could raise claim of discrimination under 42 U.S.C. § 1981); Mitchum v. Foster, 407 U.S. 225, 239 n.30, 92 S.Ct. 2151, 2160 n.30, 32 L.Ed.2d 705 (1972) (noting in section 1983 case that the Civil Rights Act of 1871 provides a civil remedy to all people, not just for those "whose former condition may have been that of slaves") (quotation and citation omitted); Park v. City of Atlanta, 120 F.3d 1157, 1161-62 (11th Cir. 1997) (stating that non-blacks are protected under section 1985(3)); cf. Lyes v. City of Riviera Beach, Fla., 166 F.3d 1332, 1338 (11th Cir. 1999) (en banc) (stating that women are a protected class under section 1985(3)); see generally Griffin, 403 U.S. at 102, 91 S.Ct. at 1798 (stating that under section 1985(3) there must be "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action").

clause does not specifically mention injuring witnesses on account of testifying in state court. That the same language was not included in the second clause did give us pause. See generally United States v. DBB, Inc., 180 F.3d 1277, 1281-82 (11th Cir. 1999). If Congress had specifically spelled out that retaliation against a witness who testified in a state court proceeding was prohibited, our job would be easier. But we recognize that it is possible for Congress to encompass the same meaning in different words, and we again recall the history. See id. at 1283 ("[w]hen interpreting an ambiguous statute, a court should consider the purpose, the subject matter and the condition of affairs which led to its enactment, and so construe it as to effectuate and not destroy the spirit and force of the law and not to render it absurd") (quotation and citation omitted).

Based upon the language of the statute and fortified by the history, we are convinced that, although language about injuring a "witness" on account of his having "testified" is absent, the language in the second clause of section 1985(2) includes a cause of action for race-based retaliation against witnesses who truthfully testify in state criminal proceedings.

Accepting Chavis's allegations as true and reading the record in his favor, we conclude that the complained-about activities state a claim under the second clause of section 1985(2) in this case. Plaintiff alleges and has evidenced that

10

Defendants (because of their racial animosity towards DW) retaliated against Plaintiff -- that is, sought to injure him -- for truthfully testifying to her advantage at a criminal proceeding, that is, for attempting to enforce DW's right to the equal protection of the laws.[6]

Although Defendants' racial animosity was not aimed at Chavis's own race directly, it was aimed at him because of his testimony, an act that enforced DW's -- a person who Defendants wished to hinder on account of her race -- right to equal protection of the law.  We do conclude that such race-based retaliatory efforts tied to criminal proceedings in the state courts do implicate the criminal defendant's (in this case, DW's) right to equal protection of the law.  See generally Powers v. Ohio, 499 U.S. 400, 415, 111 S.Ct. 1364, 1373, 113 L.Ed.2d 411 (1991) (intentional racial discrimination tied to the administration of criminal justice violates equal protection rights); Griffin v. Illinois, 351 U.S. 12, 17, 76 S.Ct. 585, 589-90, 100 L.Ed. 891 (1956) ("equal protection . . . emphasize[s] the central aim of our entire judicial system--all people charged with crime must, so far as the law is concerned, stand on an equality before the bar of justice in every American court")(quotation and citation omitted) (emphasis added).  Furthermore, given the

---

[6]The Oxford English Dictionary defines "enforce" as "To strengthen . . . to impart resolution or fortitude to . . . to encourage."  Oxford English Dictionary, Vol. V, 244 (1989).

words of the second clause, we believe that race-based retaliatory conduct aimed against a person who testified truthfully in criminal court in a way that was helpful to a person of a particular race -- the "wrong" race in Defendants' eyes -- is within the borders of the kind of behavior that Congress sought to prevent and punish in enacting the second clause of section 1985(2).  See Cong. Globe 42d Cong., 1st Sess., App. 190 ("The apprehension of violence prevents good men from arresting the evils they see").

Chavis's evidenced allegations --  that Defendants (because of their racial animosity towards DW) retaliated against Chavis for truthfully testifying to DW's advantage in court -- could support a claim under section 1985(2).  The district court's determination to the contrary was error.  Therefore, except for the section 1983 claim, we vacate the summary judgment and remand the case so the district court may consider whether summary judgment is otherwise appropriate.[7] Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1322 n. 4 (11th Cir. 2001).

AFFIRMED IN PART, VACATED IN PART AND REMANDED.

---

[7]Because the district court determined that Chavis failed to present a plausible theory that would satisfy section 1985(2), the district court did not address whether CCSD could be held liable for Hairston and Pearson's alleged acts, whether the alleged retaliation is causally connected to the adverse employment acts, or whether affirmative defenses are applicable.  We express no opinion on these issues, but leave them to the district court to determine in the first instance.

12